[Civ. No. 22717. Third Dist. Dec. 18, 1984.]

WILLIAM DAL PORTO & SONS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

542

## COUNSEL

Nomellini & Grilli, Dante John Nomellini and Daniel A. McDaniel for Petitioner.

Manuel M. Medeiros and Cathy Christian for Respondent.

Dianna Lyons, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

## OPINION

SIMS, J.—By this petition, William Dal Porto & Sons, Inc., seeks statutory review (Lab. Code, § 1160.8)[1] of a decision of the Agricultural Labor Relations Board (ALRB or Board) which found that William Dal Porto & Sons, Inc. (petitioner, Dal Porto or employer), committed unfair labor practices in violation of section 1153, subdivisions (a) and (e) of the Agricultural Labor Relations Act of 1975 (ALRA or Act) (Lab. Code, § 1140 et seq.) by bargaining in bad faith with regard to issues of union security and suc-

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

cessorship, and by unilaterally raising the wages of certain employees. We affirm the Board's finding of bad faith bargaining with respect to issues of union security and the unilateral wage increase. However, we annul the Board's determination that Dal Porto bargained in bad faith on the issue of successorship. In light of our annulment of a bad-faith determination, we remand to the Board for reconsideration of its imposed remedial order.

### FACTUAL AND PROCEDURAL BACKGROUND

Dal Porto is a closely held family corporation, engaged in production of various types of agricultural produce on approximately 1,227 acres in San Joaquin County. One-eighth of its land is owned by the family outright and the remainder is held pursuant to a long-term lease. William Dal Porto, Sr., is president of the corporation and his sons Bill and Bob are vice president and secretary-treasurer, respectively. Dal Porto's business office is located in Bob's home; Bob's wife, Pat Dal Porto, works in the office part time as the company bookkeeper.

One of Pat Dal Porto's functions is to make any necessary deductions from an employee's paycheck, including the amount to be deducted in repayment of loans which Dal Porto extends to some of its workers.

Dal Porto employs five or six full-time workers (steadies), and a seasonal work force of up to 20 to 25 weeders or thinners (general labor). The weeding and thinning work usually begins in late May and concludes in mid-July.

The United Farm Workers Union of America, AFL-CIO (UFW or union) was certified as the exclusive bargaining representative of Dal Porto's agricultural employees on December 11, 1975. Bargaining commenced on January 27, 1976, and a number of negotiating sessions were held through August 22, 1979.

After the August 1979 session, the parties did not meet again until April 1, 1981. Between April 1, 1981, and October 21, 1981, Dal Porto and the UFW met 16 times in their attempt to conclude a contract. Dal Porto was represented throughout the negotiations by Attorney Dante Nomellini, and the primary, although not the exclusive, negotiator for the UFW was Art Rodriguez.

On charges filed by the UFW, the Board's Delano regional director issued a complaint alleging, as relevant here, that Dal Porto had failed or refused to bargain in good faith (§ 1153, subd. (e)) during the negotiating sessions

conducted between April and October 1981. An administrative law officer (ALO) heard the complaint and concluded that Dal Porto had engaged in "surface bargaining" in negotiating issues concerning wage increases, successorship and union security and had unilaterally increased the wages of certain employees unlawfully.[2]

The Board rejected the ALO's finding that Dal Porto acted in bad faith with respect to wage proposals, but agreed that its "bargaining conduct with respect to issues of successorship and union security, together with its granting of a unilateral wage increase . . . provides sufficient evidence of a failure to bargain in good faith." The Board adopted the ALO's recommendation ordering Dal Porto to "Make whole its present and former agricultural employees for all losses of pay and other economic losses they have suffered as a result of [petitioner's] failure and refusal to bargain in good faith with the UFW . . . the period of said obligation to extend from April 1, 1981 . . . until such time as [petitioner] commences good faith bargaining. . . ."[3]

I

We first address the appropriate standard of review of the Board's decision. ■ The right to judicial review guaranteed by section 1160.8 exists to insure that the Board operates within the statutory powers conferred. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 39-40 [160 Cal.Rptr. 710, 603 P.2d 1306].) This requires courts to assume the responsibility for assessing the reasonableness and fairness of Board decisions. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930 [156 Cal.Rptr. 152].)

The Board's factual findings, including those of petitioner's intent and state of mind, are conclusive if supported by substantial evidence on the record considered as a whole. (§ 1160.8; *Triple E Produce Corp.* v. *Agricultural Labor Relations Bd.* (1983) 35 Cal.3d 42, 47-48 [196 Cal.Rptr. 518, 671 P.2d 1260].) Review of the entire record requires assessment not only of evidence supporting the Board but also of " 'other relevant facts of record which rebut or explain that evidence.' " (*Martori Brothers Distrib-*

---

[2]The ALO recommended dismissing charges that Dal Porto failed to provide information and unlawfully transferred an employee to the night shift; the ALO also recommended that charges of unlawful threats against an employee be upheld.

[3]The Board rejected the ALO's finding that petitioner's wage offers were "meager" and "insubstantial," and was therefore unwilling to infer bad faith from its bargaining position on that issue. The Board affirmed the ALO's finding that petitioner had unlawfully threatened an employee; that finding, however, is not challenged here.

*utors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60].) The reviewing court may neither reweigh the evidence nor substitute its judgment with respect to questions of credibility. (*Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 20-21 [173 Cal.Rptr. 856]; see also *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305]; *Labor Board* v. *Link-Belt Co.* (1941) 311 U.S. 584, 597 [85 L.Ed. 368, 378, 61 S.Ct. 358].)

In cases such as this one, where the Board is called upon to draw inferences from the parties' conduct during negotiations, the standard for court review of the Board's determinations is deferential. In *Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, the Ninth Circuit Court of Appeals explained[4] that "Deference is accorded the [NLRB's] factual conclusions for a different reason—Board members are presumed to have broad experience and expertise in labor-management relations. [Citation.] Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute. Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony, unless those inferences are 'irrational,' [citation] 'tenuous' or 'unwarranted.' [Citation]." (P. 1079.)

## II

Having these principles in mind, we turn to the Board's findings of bad faith bargaining.

The duty to bargain in good faith under the ALRA is set forth in subdivision (e) of section 1153, which provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following: . . . (e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions . . . of this part."[5]

Section 1155.2, subdivision (a), defines good faith bargaining: ". . . to bargain collectively in good faith is the performance of the mutual obligation of the agricultural employer and the representative of the agricultural employees to meet at reasonable times and confer in good faith with respect

---

[4]The ALRA directs that we rely where appropriate on applicable NLRA precedent. (See § 1148; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 949].)

[5]Subdivision (e) of section 1153 corresponds to section 8(a)(5) of the National Labor Relations Act (NLRA). (29 U.S.C. § 158(a)(5).)

to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any questions arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, *but such obligation does not compel either party to agree to a proposal or require the making of a concession."* (Italics added.)

■ The portion of section 1155.2 italicized is at the heart of the critically important distinction between "surface bargaining" and "hard bargaining." The former, which violates the Act's requirement that parties negotiate in good faith, is defined as " 'going through the motions of negotiating,' without any real intent to reach an agreement." (*K-Mart Corp.* v. *N.L.R.B.* (9th Cir. 1980) 626 F.2d 704, 706.) "Hard bargaining," on the other hand, is found where a party genuinely and sincerely insists on provisions that the other party deems unacceptable, even though it may produce a stalemate. (*Pease Co.* v. *N.L.R.B.* (6th Cir. 1981) 666 F.2d 1044, 1049, cert. den. 456 U.S. 974 [72 L.Ed.2d 848, 102 S.Ct. 2238]; see also *N.L.R.B.* v. *Tomco Communications, Inc.* (9th Cir. 1978) 567 F.2d 871.) As explained in *Pease Co.* v. *N.L.R.B., supra,* 666 F.2d at page 1049, "good faith bargaining does not require that [a company] make proposals that are acceptable to [the union]. . . . A lack of good faith . . . may be found only from 'conduct clearly showing an intent not to enter into a contract of any nature.' [Citation.]"

■ The problem in resolving a charge of bad faith bargaining is to "*ascertain the state of mind of the party charged,* insofar as it bears upon that party's negotiations." (*Continental Insurance Company* v. *N.L.R.B.* (2d Cir. 1974) 495 F.2d 44, 48, italics added.) State of mind is a question not of law but of fact, and is most often established by circumstantial evidence. (See *Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d at p. 758; *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 334 [165 Cal.Rptr. 887].) Absent evidence of specific conduct which constitutes a per se violation of a duty to bargain in good faith, "the determination of intent must be founded upon the party's overall conduct and the totality of the circumstances . . . ." (*Continental Insurance Company* v. *N.L.R.B., supra,* 495 F.2d at p. 48.) As was said in *Labor Board* v. *Truitt Mfg. Co.* (1956) 351 U.S. 149, 155 [100 L.Ed. 1027, 1033, 76 S.Ct. 753]: "A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination." (Frankfurter, J. conc./dis. opn.)

We are asked to review three findings of bad faith bargaining. The first concerns a dispute over responsibility for collecting union dues.

### Union Security (Dues Checkoff)

The parties had agreed upon some 30 articles when they reconvened April 1, 1981 (unless otherwise indicated, all date references hereafter are to the year 1981). Still under negotiation was the UFW's proposal for union security, which consisted of three elements: (1) a "dues checkoff" provision which would require Dal Porto to deduct union fees from the paychecks of UFW members and forward them to the union; (2) a provision requiring newly hired employees to join the union by the fifth day of employment; and (3) a provision requiring Dal Porto to distribute the union's dues checkoff authorization forms.

Dal Porto was at the outset opposed to dues checkoff because of the additional strain it would place on the family bookkeeper, Pat Dal Porto, and because of the costs of additional bookkeeping, whether undertaken by Pat Dal Porto or by an outside bookkeeping service. The union later agreed (on Apr. 15) to Dal Porto's proposal to extend the time in which a new worker was required to become a union member from five to seven days.

At the April 20 meeting the UFW first reoffered the union security provision it had proposed on April 15. Dal Porto rejected the proposal by stating, once again, that they didn't want to assume additional bookkeeping responsibilities, adding that dues collection was union, not company, business. Though the company wanted the union to pay for dues checkoff, neither side bothered to ascertain the actual bookkeeping cost of deducting dues. The company continued to insist that the union distribute the dues checkoff authorization forms.

Union President Cesar Chavez then told Dal Porto's negotiator Nomellini that each of the 250 contracts the UFW held with growers throughout the state—some with farming operations smaller than the Dal Porto's—required the employer to deduct union dues from an employee's paycheck.[6] Chavez also argued that there were problems for the employer associated with the union collecting dues, viz., many union organizers would need access to company property to collect dues each month, and if a worker should fail to pay dues—and therefore no longer be a union member in good standing— the employer would be forced to discharge the worker. UFW negotiator Rodriguez argued there would be little administrative inconvenience since

---

[6]The testimony was uncontradicted.

Dal Porto was already making deductions for social security, federal income tax, and disability.

The union then withdrew its demand that Dal Porto furnish its employees dues authorization forms and offered a proposal which would permit a UFW steward to collect union dues from employees during work hours—but without loss of pay to the steward. Nomellini in response indicated again that Dal Porto believed the cost of collecting dues should be borne by the union.

The UFW responded with a new proposed one-year agreement (rather than three) containing several changes. With respect to union security it resubmitted the proposal for dues checkoff but "lowered the wages [demand] considerably so that [Dal Porto could] use that money to pay for [the] cost . . . for the check-off." Nomellini rejected the one-year package because of its short duration and because it provided for a 50-cent increase for general labor.

Neither party made any significant changes in their respective bargaining positions on dues checkoff at the meetings held after April 20.

The ALO ruled that Dal Porto "consistently remained opposed to the [UFW's] proposals on union security . . . because of what it regarded would be an added unacceptable bookkeeping expense. Yet [Dal Porto] never made clear why this [additional] expense was intolerable to it except for vague references to higher costs and Mrs. Dal Porto's unwillingness to do more work. [Fn. omitted.] In fact, Nomellini never even attempted to ascertain what additional costs would be involved in the performance of those alleged greater duties, never contacted an outside bookkeeping firm for its estimate, and never presented time estimates the added accounting computations would supposedly take." The ALO further stated that in view of the deductions already being made for social security, federal income tax and disability, "the added work-load would have been minimal at best."

■ We have noted above that section 1155.2, subdivision (a), does not require a party to negotiation to accept a particular proposal or to make a particular concession. However, a party's consistent refusal to make an informed assessment of the other party's proposal, coupled with a consistent rejection of the other party's efforts to make its proposal more acceptable to the party, may give rise to an inference that the party is not interested in reaching agreement but is merely "going though the motions of negotiating." (*K-Mart Corp.* v. *N.L.R.B.*, *supra*, 626 F.2d at p. 706.)

■ The ALO was entitled to infer that Dal Porto was merely "going though the motions" on the union security article from the latter's conduct

on two points. First, Dal Porto consistently refused to assume the expense of dues collection without ever ascertaining, or asking the union to ascertain, the amount of expense involved. Dal Porto in effect answered "no" before it knew just what the question was. The only indication in the record as to the probable cost of collecting dues was the statement of UFW President Chavez that the provision had been accepted by all 250 growers with UFW contracts; the inference, of course, is that the cost is not prohibitive.

It must be emphasized that section 1155.2 prohibits the board's drawing an inference of bad faith bargaining from Dal Porto's mere act of rejecting a dues collection proposal. In this case, however, there was more than a mere rejection of a specific proposal. Dal Porto in effect refused even to *evaluate* what the union was suggesting. Dal Porto thus rejected not a specific proposal but its very duty to participate in the *process* of bargaining on an important issue.

In inferring bad faith from Dal Porto's failure to determine the cost of collecting members' dues, the ALO relied on sound ALRB precedent. In *Montebello Rose Co.* (1979) 5 A.L.R.B. No. 64, enforced (1981) 119 Cal.App.3d 1 [173 Cal.Rptr. 856], the Board stated, in response to an employer's opposition to dues checkoff because of added costs: "Respondents never explored possible compromises with the UFW to cut down the total amount of paperwork, e.g., by eliminating other paperwork requirements of the contract proposal, or by introducing other cost-cutting measures which could have made the acceptance of a dues checkoff provision more attractive.[7] Thus, Respondents insisted that they would not accept a dues checkoff provision because of the added clerical burden *without having made any effort to determine what the burden would be.* Respondents' arbitrary and unyielding rejection of the UFW's dues checkoff proposal is thus revealed not as an honestly-held concern, but as a method by which to frustrate negotiations and avoid signing a contract." (Pp. 23-24; italics added.)

*Montebello Rose* is controlling here, inasmuch as Dal Porto's only "noneconomic" objections to dues collection, the burden on Pat Dal Porto and the need to deal with worker complaints about reduced paychecks, were removed by the *union's* proposal to let the steward collect the dues while on the company payroll.[8]

---

[7]In this case the union made concessions aimed at reducing the amount of paperwork. As of April 20, the union had offered to change the time in which a worker had to join the union to correspond with employee pay periods; offered to have the union steward collect initiation fees; and agreed to furnish employees with dues-authorization forms.

[8]Nothing in the record suggests that Dal Porto, a corporation, would be unduly burdened by having to retain outside bookkeeping services, so long as the cost thereof was offset by reductions in wages.

It should also be emphasized that Dal Porto could easily have shifted the onus back onto the UFW by asking for some specifics as to the costs involved in collecting the members' dues. Dal Porto would then be in a position to complain that the UFW did no more that it did to determine what the actual expenses would be. That, however, was not Dal Porto's chosen tactic; it chose instead to reject *any* involvement in the collection of dues, conscious of the fact that it knew not the parameters of what it was refusing.

In stark contrast to Dal Porto's refusal to evaluate the UFW's request, the union agreed in one of its April 20 proposals to lower its wage request in order to offset the expense of collecting dues. Such a concession underscores the importance to the UFW of the dues-collection provision, and the union's willingness to make concessions in order "to accommodate [Dal Porto's] problems."

The ALO was also entitled to infer lack of intent to reach agreement from Dal Porto's continued objection to the "cost" of dues collection after the UFW agreed to reduce its wage request by an offsetting amount. Instead of ascertaining the actual cost of the dues collection and the necessary adjustment in the wage request, Dal Porto merely persisted in rejecting the union's offers. Thus, the dispute went beyond the employer's mere insistence in good faith that the union bear the cost and the union's good faith insistence that the employer bear the cost. Rather, the ALO was entitled to view Dal Porto's continued objection to dues collection following the UFW's reducing its wage proposal as evidence of lack of intent to reach any agreement at all.[9]

In sum, the ALO's finding, adopted by the Board, that Dal Porto exhibited a "lack of interest in reaching an agreement" on this issue is neither "irrational," "tenuous," nor "unwarranted." (*Pensaquitos Village, Inc.* v. *N.L.R.B., supra,* 565 F.2d at p. 1079.) The finding is supported by substantial evidence on the record considered as a whole, and will not be disturbed. (§ 1160.8; *Triple E Produce Corp.* v. *Agricultural Labor Relations Bd., supra,* 35 Cal.3d at pp. 47-48.)

*Unilateral Wage Increase*

The ALO found that "[Dal Porto] proposed on April 20 . . . a $3.50 rate for general labor to be effective on May 30 (around the start of the weeding and thinning season), that on May 13 Nomellini told Rodriguez that he felt

---

[9]The ALO aptly likened Dal Porto's position on this issue to "a company's offering its employees a 25 cent raise per hour if the union pays for it."

an increase from $3.35 to $3.50 was in order, that '. . . we'd like to do it through you, with your consent, if possible, . . .', that Rodriguez replied he would consider it, and that on May 21, one week later, [Dal Porto] began to pay its weeders and thinners $3.50 per hour without the Union's consent." The ALO concluded that "the increase here, coupled with the manner of its implementation compels the conclusion that [Dal Porto] unilaterally instituted an unlawful wage increase in the midst of negotiations and without consent of the Union." ▉ Dal Porto argues that the claimed unilateral change in wages does not support the finding of surface bargaining. We disagree.

It is indisputable that unilateral action as to a subject of bargaining is a circumvention of the duty to negotiate in good faith. (*Labor Board* v. *Katz* (1962) 369 U.S. 736, 743 [8 L.Ed.2d 230, 236, 82 S.Ct. 1107].) Dal Porto seeks to distinguish this case from the rule of *Katz* by bringing it within the fair notice exception noted in *N.L.R.B.* v. *Tex-Tan, Inc.* (5th Cir. 1963) 318 F.2d 472. *Tex-Tan* is inapposite for two reasons. First, the wage increase there had been "the subject of prior extensive negotiations and discussions in the bargaining sessions." (*Id.*, at p. 480.) Here, the ALO made the following factual findings to the contrary:[10] "By deciding to consider [Dal Porto's] proposed change, the Union did not agree to its implementation or waive its right to bargain over the subject matter. It is clear that Rodriguez merely told Nomellini he would take a look at his proposal and left the matter at that. In fact, *the increase came so fast (one week later) that the Union did not have much opportunity to take any position at all on its institution. What is evident is that there was absolutely no negotiation over the increase, and the Union did not consent to it.*" (Italics added.)

Section 1160.8 provides in pertinent part, with respect to review by this court, that, "The findings of the board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." (See *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579].) In our view, the Board's adopted findings—that there was no negotiation of the wage increase and that "the union did not have much opportunity to take any position at all on its institution"—are supported by substantial evidence on the whole record and consequently cannot be disturbed on appeal.

A second distinction between this case and *Tex-Tan* is that in the latter, "the Union was informed that in the immediate future the Employer would

---

[10]These findings were necessarily adopted by the Board when it approved and incorporated the ALO's findings on this issue.

institute changes as a matter of economic necessity." (*N.L.R.B.* v. *Tex-Tan, Inc.*, *supra*, 318 F.2d at p. 480.) Here, by way of contrast, the employer never gave the union unequivocal notice it would grant the wage increase. Rather, the statements of the employer were uniformly to the effect that it wanted to accomplish the increase *with the union's consent* and that the employer was waiting for the union's response. The distinction is crucial to the fundamental goal to be achieved: negotiation and bargaining. Where a union is presented with clear notice that, at some point in the future, the employer will institute a wage increase, the union knows it has to fish or cut bait before the increase is implemented, assuming reasonable time for negotiation. However, where, as here, the employer gives the impression it will not implement the increase without the union's consent (or at least further notice), the incentive for urgent and immediate bargaining is removed and, as happened in this case, the issue is not even discussed before the wage increase is implemented. The net result is that the union is stuck with an unannounced wage increase which it reasonably assumed was the subject of future bargaining.

The Board's order should also be upheld because the record demonstrates Dal Porto deceived the union about the actual granting of the wage increase.

The wage increase was implemented May 21. The increase was not disclosed at the negotiating session of May 27. In fact, Dal Porto never disclosed the wage increase during negotiations; rather, the union found out about it on its own some six weeks after it had been granted. The effect of that belated discovery on negotiations is described by the ALO in his summary of the testimony of Rodriguez, the chief union negotiator, as follows: "Rodriguez testified that just prior to the June 30 session a member of the Union Committee learned for the first time that the weeding and thinning crew was being paid $3.50 per hour. Rodriguez also testified that he was very upset when he found out about the increase because his proposals were based upon the understanding that the general laborers were receiving $3.35 an hour and that [Dal Porto] was offering a 15 cent increase. He testified he accused Respondent of making a unilateral change and implementing a wage increase without the prior consent of the Union for such an action." (Fn. omitted.)

Section 1153, subdivision (e) makes it an unfair labor practice "To refuse to bargain collectively *in good faith* . . . ." (Italics added.) Section 1155.2, subdivision (a) defines good-faith collective bargaining as "the mutual obligation . . . to meet at reasonable times and confer *in good faith* with respect to wages . . . ."

Section 1148, as we have noted, requires the Board to follow applicable precedents of the National Labor Relations Act. (*Triple E Produce Corp.* v. *Agricultural Labor Relations Bd.*, *supra*, 35 Cal.3d at p. 48.) Good faith bargaining necessarily requires that claims and information made or supplied during negotiations be honest. (*Labor Board* v. *Truitt Mfg. Co.*, *supra*, 351 U.S. at pp. 152-153 [100 L.Ed. at p. 1032].)

The record demonstrates Dal Porto was not honest about the implementation of the wage increase and that its deception torpedoed negotiations. Veracity of information is essential to the bargaining process. A party to collective bargaining cannot reasonably be expected to bargain "in good faith" with an adversary who disguises the truth about an essential subject of bargaining.

Dal Porto attempts to neutralize its deception of June 15 by arguing that the wage increase was only a de minimus technical violation. The argument is specious. The fact the employer told the union on June 15 that "we're waiting for your response" suggests that the employer consistently took the position it would not grant the wage increase absent consent by the union or further notice. The statements of June 15, together with the actual fact of the undisclosed wage increase permit the further rational inference that the wage increase was not implemented in good faith in accordance with advance notice but was rather accomplished clandestinely because it was, in fact, unlawful.

Dal Porto also attempts to eradicate its problematical misrepresentations on June 15 by noting that the record indicates that negotiator Rodriguez responded, "Well, we can go ahead and agree to that, that that raise should go into effect?", thereby indicating that the UFW was not unamenable to the immediate implementation of Dal Porto's proposed increase in wages.

The import of this argument is unclear. Is Dal Porto suggesting the union was amenable to the wage increase before its implementation on May 21 or on June 15?

Either way, the argument fails because the quote from Rodriguez, taken out of context, does not permit the inference Dal Porto draws from it. In context, it clearly appears Rodriguez wanted to know, "What it is that you're talking about?" Obviously the union might have no objection to a unilateral wage increase that met or exceeded its demand, which was then $3.75 for general labor. The union could not reasonably have been amenable to implementation of a wage increase in an uncertain amount.

Viewing the whole record surrounding the granting of the wage increase, we conclude that there is substantial evidence to support the Board's finding that petitioner's granting of a unilateral wage increase constituted an unfair labor practice in violation of section 1153, subdivision (e). (*Triple E Produce Corp.* v. *Agricultural Labor Relations Bd.*, *supra*, 35 Cal.3d at pp. 47-48.)

*Successorship*

■ We lastly consider the ALO's findings on the successorship issue. We conclude the Board's finding as to this issue must be annulled.

At the April 1 meeting Nomellini proposed that the collective bargaining agreement contain a clause that the terms of the agreement were not binding on any subsequent purchasers of the company.[11] Nomellini admitted he was not aware of any attempt to sell the business during 1981, and that Dal Porto had no present intention to sell; he explained he wanted a nonbinding successorship clause because "we don't know whether or not we're going to sell, we want to keep the option open." Nomellini further testified that it was his belief that without a nonbinding successorship clause the collective bargaining agreement might be binding on a successor and that such a possibility would reduce the value of the company should there be a sale.

On April 15 the UFW withdrew its proposal for a clause purporting to "bind" successors to the collective bargaining agreement; thereafter each party offered several variations of a proposal submitted by the union, but each was rejected. At later meetings Dal Porto rejected a union proposal for a successorship clause that Nomellini had recently agreed to in negotiating a bargaining agreement for another grower, as well as a proposal that the bargaining agreement remain entirely silent on successorship rights. Thereafter, petitioner continued to insist on, and the union to oppose, a clause with nonbinding successorship language.

■ It is settled that the area of successorship is a mandatory, rather than permissive subject of bargaining. (See *United Mine Workers* (*Lone Star Steel Company*) (1977) 231 N.L.R.B. 573, mod. on other grounds in (10th Cir. 1980) 639 F.2d 545, cert. den. 450 U.S. 911 [67 L.Ed.2d 335, 101

---

[11]Dal Porto's proposal on April 1 provided: "This agreement shall not in any way be binding upon the successors, administrators, executors and assigns of the parties hereto. Company agrees that it will not sell, transfer, or assign its operations for the purpose of circumventing this agreement. Sales, transfers, or assignments for valid business reasons or purposes which have as one of their results the nullification of this agreement shall not constitute nor be construed to be a violation of this provision."

S.Ct. 1349]; *United Mine Workers of America, Local 1854* (1978) 238 N.L.R.B. 1583.) The critical questions presented, as framed by the ALO, are: "[W]hether the terms of a collective bargaining agreement are binding upon a successor [and] whether a predecessor's insistence to the point of impasse on a provision containing non-binding successorship language is evidence of surface bargaining."

In the leading case of *NLRB* v. *Burns Security Services* (1972) 406 U.S. 272, 284 [32 L.Ed.2d 61, 71, 92 S.Ct. 1571], the United States Supreme Court held "although successor employers may be bound to recognize and bargain with the union, *they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.* [Citations.]" (Italics added.)

▇▇▇ After concluding that federal precedent would be followed in this case by the ALRB, the ALO cites *Burns* to support his conclusion that Dal Porto was "in effect . . . holding up the contract over a right it had already possessed under the law." Yet union negotiator Rodriguez candidly admitted that "it's very unclear what the law provides . . . within the ALRA . . . ." However, even assuming that it should have been clear to the parties that *Burns* would be followed by the ALRB, we do not perceive it to be bad faith for Dal Porto to insist on a contract term that *merely set forth existing law.* A fundamental maxim of contract drafting is to obtain certainty of terms. (See Rest.2d Contracts, § 33.) *Burns* persuasively refutes the ALO's conclusion that Dal Porto was "Adhereing [*sic*] to an untenable legal position during negotiations . . . inconsistent with the obligation to bargain in good faith."

Given the assumed applicability of *Burns,* we further reject the ALO's conclusion that Dal Porto's "successorship proposal offered terms it knew to be unacceptable to the union and which the union would reject. [Citations.]" Indeed, we are constrained to ask why the UFW should have been so unalterably opposed to what is assumed to be a legal fait accompli.

It is clear from the parties' respective bargaining positions that neither was assuming that the ALRB would necessarily follow *Burns.* ▇▇▇ Although section 1148 of the ALRA states that "The board shall follow applicable precedents of the National Labor Relations Act, as amended," the ALRB has on occasion deviated from federal precedent. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413; *Montebello Rose Co.* v. *Agricultural Labor Relations Bd., supra,* 119 Cal.App.3d at p. 27.) As the California Supreme Court recently acknowledged, "[T]he board may diverge from federal precedents if the particular

problems of labor relations within the agricultural context justify such treatment." (*Triple E Produce Corp.* v. *Agricultural Labor Relations Bd., supra,* 35 Cal.3d at p. 48.)

 The Supreme Court's opinion in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 874 [176 Cal.Rptr. 768, 633 P.2d 964], decided after the negotiations on successorship between Dal Porto and the UFW were essentially at a stalemate, demonstrates the parties' prescience in refusing to assume that *Burns* would be controlling under the ALRA. In *San Clemente,* the court held that under relevant NLRB decisions a successor has an obligation to recognize and bargain with the union where there is "sufficient continuity in the . . . work force . . . ." (*Id.,* at p. 890.) However, the court explicitly stated that "in light of the unique characteristics of California's agricultural setting, considerations in addition to workforce continuity should generally play an important role in defining successorship liability under the ALRA." (*Ibid.*; see also *Rivcom Corp.* v. *Agricultural Labor Relations Board, supra,* 34 Cal.3d at p. 765, fn. 18.)[12]

The UFW opposed the inclusion of petitioner's proposed successorship clause precisely because it was not certain—absent such a clause—whether the terms of the collective bargaining agreement would be binding upon a successor. Union negotiator Rodriguez testified that the result of having no successorship clause would be to "let the courts of law decide . . . ." The union obviously hoped that the ALRB would diverge from federal precedent and hold that a bargaining contract is statutorily binding on a successor, since otherwise there would have been no basis for opposing petitioner's proposal.

Moreover, as the ALO noted, "there have been exceptions to *Burns*"— and there was really no way to predict whether this case might come within one if a sale took place. In our view Dal Porto was simply attempting to insure certainty of contract terms by insisting on a nonbinding successorship

---

[12]In *San Clemente,* the court (at p. 883) noted that "Neither the ALRA, nor the NLRA upon which our state act was largely modeled, contains any specific statutory provision relating to the successorship issue.[11]" The court's footnote 11 provides: "In 1976, one year after the passage of the ALRA, the California Legislature enacted Labor Code section 1127, relating generally to 'successor clauses' in collective bargaining agreements. Section 1127, subdivision (b) defines 'successor employer' for purposes of that provision to mean 'any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer.' Subdivision (c) of the provision, however, specifically states that '[t]his section shall not apply to . . . any employer who is subject to the National Labor Relations Act [or the] Agricultural Labor Relations Act of 1975 . . . .'"

clause. As negotiator Rodriguez stated: "[Dal Porto] wanted to make sure
. . . that they were able to clarify as much as possible everything they could
regarding [the] successor within the contract itself."

The ALO opined that Dal Porto could have insured against its "specula-
tive fear" that the ALRB would not follow *Burns* by offering the UFW a
proposal whereby the union would "indemnify it for any lower cost received
for its property owing to the existence of the labor contract." Even assum-
ing arguendo the proposal has some abstract value, the ALO had no au-
thority to control the settling of terms of collective bargaining agreements.
(*Labor Board* v. *Insurance Agents* (1960) 361 U.S. 477 [4 L.Ed.2d 454, 80
S.Ct. 419].) Moreover, we have found no case imputing bad faith to a party
for failure to act on a proposal which was never discussed and of which it
had no apparent knowledge. Additionally, under the circumstances here, it
was wholly speculative for the Board to assume the proposal advanced by
the ALO would have been acceptable to the union.[13]

At one point in the negotiations Nomellini stated that selling a business
with a union contract at this time was "like selling it with the plague." The
ALO challenges this assertion by citing several authorities to support the
theory that the imposition of a predecessor's collective bargaining contract
may " 'encourage the transfer of capital.' " (See Henry, *Is There Arbitration
After Burns: The Resurrection of John Wiley & Sons* (1978) 31 Vand.L.Rev.
249, 295; *International Ass'n of Machinists, Dist. Lodge 94* v. *N.L.R.B.*
(D.C.Cir. 1969) 414 F.2d 1135 (conc. opn.), cert. den. 396 U.S. 889 [24
L.Ed.2d 163, 90 S.Ct. 174].) However, as the U.S. Supreme Court rec-
ognized in *NLRB* v. *Burns Security Services, supra,* 406 U.S. 272, it is also
true that a potential purchaser may only be willing to take over a moribund
business if he can make changes, including changes in the old collective
bargaining agreement. ▮▮ ▮▮▮ While Dal Porto offered no sta-
tistical evidence of the effect of successorship liability on agricultural land
transfers, *neither did the UFW.*[14] The only evidence on the matter was

---

[13]The ALO asserts that in the alternative "the purchase agreement could include an in-
demnification agreement whereby [Dal Porto] agreed to reimburse the successor for specified
additional liabilities arising out of the eventuality of the ALRB's . . . finding that the con-
tract . . . survived. . . . [T]his reimbursement could be charged to the Union per previous
agreement." The ALO also suggests that Dal Porto "could contract with a successor that
the purchase price be reduced, liquidated damages be awarded, or the agreement be can-
celled in the event its labor agreement was imposed on the successor through the ALRB,
arbitral or judicial action." As with the ALO's suggested indemnity clause, these proposals,
while perhaps of some abstract value, were never discussed at the table and thus cannot
under the circumstances here be the basis for a finding of bad faith.

[14]The burden of proof rested *upon the UFW and the Board* to establish that Dal Porto
acted in bad faith. (§ 1160.3; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations
Bd., supra,* 93 Cal.App.3d at p. 936; *Stone & Webster Engineering Corp.* v. *N.L.R.B.* (1st
Cir. 1976) 536 F.2d 461, 464.)

Nomellini's testimony that successorship liability would depress market value, a not unsurprising fact given the current realities of agricultural relations. In any event, the authorities cited for the proposition that the imposition of successorship encourages acquisitions and mergers are simply not so compelling as to raise the inference that Dal Porto must have been stonewalling for a successorship clause in order to frustrate consummation of a collective bargaining agreement.[15]

Both the ALO and the Board concluded that Dal Porto's position "remained basically unchanged throughout negotiations." Yet this was not the kind of issue amenable to the give and take bargaining that might be found with respect to wages or some working conditions. Furthermore, we do not think the union's position was as accommodating as the ALO suggests. Although it did agree to drop its demand for a clause binding a successor to the collective bargaining agreement, this alleged concession was more cosmetic than real, as the ALO himself noted when he stated that "a successorship clause, dealing as it does only with future contingencies, is often merely a 'bargaining chip' that the union will often, as it did here, forego in order to obtain concessions in areas of more immediate concern to it, such as wages and working conditions."

■■■ In sum, there is nothing in the record to support the inference that Dal Porto insisted on a successorship clause merely to frustrate the bargaining process. Given the holding in *Burns* that collective bargaining agreements do not automatically survive, such insistence—contrary to the ALO's finding—was not "so obviously objectionable to the other party . . . that it is fair to infer the object of the proposal was to disrupt negotiation." ■■■ As the United States Supreme Court stated in *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474 at page 490 [95 L.Ed. 456 at pages 468-469, 71 S.Ct. 456], *"Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. . . .* The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of

[15]The ALO states that Dal Porto rejected a proposal for a successorship clause like that contained in a collective bargaining agreement negotiated by Nomellini for another grower, which provided that the agreement was binding on successors. Dal Porto argued that the diminution in market price would have greater effect on them because they were a smaller operation than the other grower, and leased most of the land they farmed. The ALO stated he "fail[ed] to appreciate [the] argument" because "with their ⅛ interest [they would] stand to lose proportionately less than such other owners . . . ."

The ALO has misconstrued Dal Porto's concern. Petitioner was not arguing that he would suffer a greater proportionate loss, but rather they were not as "well off financially" and thus would be less able to absorb a loss than the grower whose farm was far more valuable.

witnesses or its informed judgment on matters within its special competence or both." (Italics added.) We conclude the Board's finding that Dal Porto engaged in bad faith bargaining on the issue of successorship must be annulled.

Although we have affirmed two of three contested findings of bad faith bargaining, we cannot assume the Board would impose the same penalty for two violations as for three.[16] Consequently, we also annul that portion of the Board's order requiring Dal Porto to provide "make-whole" relief in order to allow the Board to reconsider the appropriate remedial order in light of this opinion. (See § 1160.3; *J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 31.)

## DISPOSITION

The portion of respondent's final decision and order finding that petitioner committed an unfair labor practice by bargaining in bad faith on the issue of successorship is annulled. Respondent's order for "make-whole" relief is also annulled. In all other respects, respondent's final decision and order is affirmed. The matter is remanded to the Board for reconsideration and reformulation of a new remedial order.

Sparks, J., concurred.

**EVANS, Acting P. J.,** Concurring and Dissenting.—I concur in that portion of the majority opinion annulling the Agricultural Labor Relations Board's (ALRB or Board) finding on successorship. I must respectfully dissent from the majority conclusion that petitioner bargained in bad faith with real party in interest (UFW or Union) on issues of union security (dues checkoff) and unilateral wage increase. My dissent is predicated upon my perception of the evidence and decided appellate authority.

The administrative law officer (ALO) found that William Dal Porto & Sons, Inc. (Dal Porto) "consistently remained opposed to the [UFW's] proposals on union security . . . because of what it regarded would be an added unacceptable bookkeeping expense. Yet [Dal Porto] never made clear why this [additional] expense was intolerable to it except for vague references to higher costs and Mrs. Dal Porto's unwillingness to do more work. [Fn. omitted.] In fact, Nomellini never even attempted to ascertain what additional costs would be involved in the performance of those alleged greater duties, never contacted an outside bookkeeping firm for its estimate, and

---

[16]We do not suggest a "make-whole" remedy is inappropriate as a matter of law.

never presented time estimates the added accounting computations would supposedly take." The ALO further stated that in view of the deductions already being made, "the added workload would have been minimal at best." I find those findings and conclusions to be without support in the evidence.

It is uncontroverted that Dal Porto opposed dues checkoff because it did not want to absorb additional bookkeeping costs. Although the ALO depre- cates the amount of bookkeeping that would have been required as "a small effort of a routine nature," it is illuminating that *at no time* did the UFW offer to assume any portion of the additional costs. If, as the ALO opined, the dues checkoff provision was in fact "of vital interest to the UFW," no doubt we might have expected to see some concession from it on the ques- tion of who should assume these costs. What this demonstrates is that for the UFW, the issue of dues collection involved a financial element of sig- nificant proportion; consequently, I believe the ALO has exaggerated the extent to which the Union "moved . . . to accommodate [Dal Porto's] prob- lems" when it agreed to collect the dues *as long as Dal Porto would bear the cost.*

In addition, I would conclude Dal Porto put forth legitimate noneconomic reasons for not wanting to take on the obligation of dues checkoff. Specifi- cally, Nomellini expressed petitioner's concern with the additional strain that might be placed on the family bookkeeper and with the fact that an outside bookkeeper might have to be hired (a perhaps undesirable contin- gency for a business that heretofore had been wholly managed by family members), its opposition to assuming Union obligations, and its desire to avoid the burden of dealing with complaints from workers regarding their reduced paychecks.

While I recognize these concerns would have been removed had petitioner accepted the UFW's April 20 proposal (i.e., that the Union would assume the obligation of collecting the dues, albeit at petitioner's expense), it does not follow that the reasons were "pretextual," since they were put forth by Nomellini *prior to April 20*[1] in response to the dues checkoff proposal. Furthermore, I would reject the argument the reasons were pretextual mere- ly because "the Company was already deducting numerous items from the workers' paychecks." Since the UFW at no time offered to assume the additional costs, I cannot infer those costs were so miniscule as to be pat-

---

[1] It was at the July 28 meeting that Nomellini stated that Dal Porto did not want to deal with worker complaints, but this was in response to the Union's resubmitted proposal that Dal Porto collect the dues.

ently unobjectionable.[2] Moreover, it cannot be said that one party bargained in bad faith for refusing to assume those costs whereas the other party—adopting an identical bargaining posture—did not.

The UFW asks how "expense" could be a "true reason when no one from the company ever knew how much, if any, added expense there might be?" It relies on *Montebello Rose Co.* (1979) 5 A.L.R.B. No. 64, in which the Board stated, in response to an employer's opposition to dues checkoff because of the additional cost factor, "Respondents never explored possible compromises with the UFW to cut down the total amount of paperwork, e.g., by eliminating other paperwork requirements of the contract proposal, or by introducing other cost-cutting measures which could have made the acceptance of a dues checkoff provision more attractive. Thus, Respondents insisted that they would not accept a dues checkoff provision because of the added clerical burden without having made any effort to determine what the burden would be. Respondents' arbitrary and unyielding rejection of the UFW's dues checkoff proposal is thus revealed not as an honestly-held concern, but as a method by which to frustrate negotiations and avoid signing a contract." (*Id.*, at pp. 23-24; see also *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1 [173 Cal.Rptr. 856].)

I view *Montebello Rose* as distinguishable; here Dal Porto put forth legitimate noneconomic reasons for opposing dues checkoff, and because it had offered to assume the burden of collecting dues as long as the Union paid the bookkeeping costs, whatever they were. Consequently, it was then the *Union* which could either agree or not agree to pay those costs, and it can likewise be said that they rejected the proposal "without having made any effort to determine what the burden would be."

I also consider the facts of this case to be distinguishable from those presented in *United Steelworkers of America, AFL-CIO* v. *N.L.R.B.* (D.C.Cir. 1966) 363 F.2d 272 (cert. den., 385 U.S. 851 [17 L.Ed.2d 80, 87 S.Ct. 90]), relied on by the Board for the proposition that a continuous rejection of a dues checkoff proposal constitutes bad faith. In that case, the court found (at p. 274) that "the collection of dues would have presented the union with a substantial problem of communication and transportation" because the employer's 300 workers lived within a radius of 35 to 40 miles of the company and the union office was "a distance of about 85 miles." In

---

[2]In condemning Dal Porto for failure to make concessions on this "routine" matter, the ALO notes that "We are, after all, merely discussing a checkoff system basically affecting 11 or 12 steady workers with a thinning crew in May for around 8 weeks . . . ." Yet the argument cuts both ways. The ALO's belief that the Union would have to send "numerous representatives to the fields" in order to collect dues from only 12 workers strains credulity.

addition, the company had no general policy against checkoff, the refusal to checkoff dues was not based on inconvenience, and a company representative had stated it was denying checkoff because it was " 'not going to aid and comfort the union.' " Finally, unlike the UFW here, the union in *United Steelworkers* offered to collect the dues at its own expense. (*Id.*, at pp. 274-275.)

It appears to me that the Board, in finding bad faith in Dal Porto's negotiating position, is doing exactly what it is constrained not to do. The Supreme Court has stated that " '[T]he Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " (*Porter Co.* v. *NLRB* (1970) 397 U.S. 99, 106 [25 L.Ed.2d 146, 152, 90 S.Ct. 821]; *Labor Board* v. *American Ins. Co.* (1952) 343 U.S. 395, 404 [96 L.Ed. 1027, 1037, 72 S.Ct. 824].) The court has also stated that section 8 of the National Labor Relations Act (NLRA) (which is substantively identical to section 1155.2 of the Agricultural Labor Relations Act (ALRA or Act)) was meant to prevent the Board from controlling the settling of the terms of collective bargaining agreements. (*Labor Board* v. *Insurance Agents* (1960) 361 U.S. 477, 487 [4 L.Ed.2d 454, 463, 80 S.Ct. 419].) I would conclude the Board has improperly injected itself into the bargaining process and that there is simply not enough evidence in the record to support a finding Dal Porto bargained in bad faith on the issue of union security and dues checkoff.

The finding of the ALO patently ignores the record and fails to acknowledge that at the May 4th and 13th negotiating sessions, Dal Porto again advised the Union of its desire to raise the weeders' wage 15 cents per hour. At the latter session Dal Porto again advised the union negotiator Rodriguez that the employer wished to raise the wage with the concurrence of the Union and to do so before the end of May. Rodriguez failed to respond at that time.

Thereafter, on June 15, the following colloquy took place:

"MR. RODRIGUEZ: The other question is in terms of—previously you had mentioned at one of the meetings a raise for the workers, but you've never discussed that since then.

"MR. NOMELLINI: Well, we're waiting for your response.

"MR. RODRIGUEZ: Uh-huh.

"MR. NOMELLINI: We were talking about a raise for the workers. You know, we had contemplated a raise and then we've got the gasoline thing

which we wanted to discontinue, and we brought that subject up to you and we haven't gotten any—

"MR. RODRIGUEZ: You didn't ask for our response on that.

"MR. NOMELLINI: Well, I think—I thought we did. But, anyway, we'd like to know because the annual time when an annual raise would have been given is—

"MR. RODRIGUEZ: At the end of May.

"MR. NOMELLINI: Yeah.

"MR. RODRIGUEZ: Well, can we go ahead and agree to that, that that raise should go into effect?

"MR. NOMELLINI: Well, that's just about—you would be agreeable then to a raise in the wages? You have no objections?

"MR. RODRIGUEZ: We'd like to know in terms of what it is that you're talking about.

"MR. NOMELLINI: Okay. And what about with regard to this gasoline thing?

"MR. RODRIGUEZ: Well, I think that should—that goes with negotiations."

In *Chatham Manufacturing Company* (1968) 172 N.L.R.B. 1948, the board in reversing a trial examiner's finding of unfair practices by a unilateral wage increase, after the employee gave the union but five days' notice of intent to increase wages, said, "While we agree with the Trial Examiner as to his other findings of unlawful unilateral action, *we believe that the notice to the Union of the proposed change . . . was sufficient to permit timely and effective bargaining.*" (Italics ours; p. 1949.)

The duty "to bargain collectively" enjoined by Labor Code section 1153, subdivision (e), is defined by section 1155.2 as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment, . . ." The ALRB has followed long-standing federal precedent and held that an employer's implementation of a change in. its employees' terms and conditions of employment, without giving the employees' certified bargaining representative prior notice thereof or an

opportunity to bargain about it, constitutes a per se violation of Labor Code section 1153, subdivisions (a) and (e), regardless of the employer's good or bad faith. (*Kaplan's Fruit and Produce Company* (1980) 6 A.L.R.B. No. 36; *O. P. Murphy Produce Company, Inc.* (1979) 5 A.L.R.B. No. 63, review den. Nov. 10, 1980, 1st Dist., Div. 4, hg. den. Dec. 10, 1980; *N. A. Pricola Produce* (1981) 7 A.L.R.B. No. 49.) By such unilateral action, an employer bypasses the employees' certified bargaining representative and thereby undermines the Union's status as the employees' chosen representative.

In *Labor Board* v. *Katz* (1962) 369 U.S. 736 [8 L.Ed.2d 230, 82 S.Ct. 1107], the United States Supreme Court explained (at p. 743 [8 L.Ed.2d at p. 236]) that the duty to bargain may be violated "without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused to even negotiate *in fact*—'to meet . . . and confer'—about any of the mandatory subjects. . . . [A]n employer's unilateral [action] . . . is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." (Italics in original; fns. omitted.)

In my view, the circumstances confronted in *Katz* are not present in this instance. The record discloses that on April 20, the Union had been given clear notice of Dal Porto's intent to institute a 15-cent-per-hour wage increase to be effective at the commencement of weeding and thinning season, sometime around the end of May. On May 4th and 13th, Dal Porto again advised the Union that a wage increase was contemplated for the weeders; the Union responded that it would consider it. The wage increase was instituted before the next negotiating session, scheduled for May 27.

A nearly identical factual situation was presented to the court in *N.L.R.B.* v. *Tex-Tan, Inc.* (5th Cir. 1963) 318 F.2d 472. There, prior to instituting unilateral wage changes, the company discussed both the nature and kind of changes contemplated with the union as well as the general proposed timing of its action. The court held that under these circumstances "the Employer was not required as a matter of law to await either the formal rejection or acceptance of the proposals by the Union." (*Id.*, at p. 480.) In this case, Dal Porto made it known that it sought to institute the change prior to commencement of the weeding and thinning season. When the issue was discussed on June 15, the union representative Rodriguez indicated he had been aware of the approximate date fixed for implementing the change. Although the discussion between the parties concerning the proposed wage increase during the April and May negotiating sessions had not been extensive, lack of consent or agreement was not due to a refusal of Dal Porto to

negotiate. The critical fact is that the Union had specific notice of the time contemplated for the wage increase and had ample time thereafter to respond.

It is improper to mechanically assume a violation of the statutory duty to "meet . . . and confer in good faith" when changes have been instituted after notice to the Union without first securing agreement or rejection by the Union. (*N.L.R.B.* v. *Tex-Tan, Inc., supra,* 318 F.2d at p. 481.) "[A]n employer does not violate the Act by unilaterally changing the terms and conditions of employment when it has first granted the union the opportunity to bargain about the mandatory subject in question. [Citations.]" (*Struthers Wells Corp.* v. *N.L.R.B.* (3d Cir. 1983) 721 F.2d 465, 472; see also *N.L.R.B.* v. *Henry Vogt Mach. Co.* (6th Cir. 1983) 718 F.2d 802, 806; *Chatham Manufacturing Company, supra,* 172 N.L.R.B. 1948.) While the Supreme Court in *N.L.R.B.* v. *Katz, supra,* 369 U.S. at page 747 [8 L.Ed.2d at page 238], does state that "Unilateral action by an employer *without prior discussion* . . . does amount to a refusal to negotiate . . . *and must of necessity obstruct bargaining*" (italics added), that case involved an employer who had instituted changes in wage proposals *without notifying the union or allowing an opportunity for discussion.* (See also *Continental Insurance Company* v. *N.L.R.B.* (2d Cir. 1974) 495 F.2d 44, 50, holding that unilateral action taken by the employer "without any [notice or] opportunity . . . to bargain over the matter" constitutes bad faith.) In *Labor Board* v. *Crompton Mills* (1949) 337 U.S. 217, 224-225 [93 L.Ed. 1320, 1326-1327, 69 S.Ct. 960], the United States Supreme Court early recognized that "a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining . . . left unaccepted or even rejected in those negotiations . . . might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of negotiations. . . ."

Although the UFW suggests that Nomellini was "misleading" Rodriguez on June 15 when they discussed the wage increase because he did not "so much as hint that the increase was already in place," the action found by the Board to be in violation of the Act occurred prior to the June 15 meeting. Our task as a reviewing court is to determine the legality of the unilateral change at the time it was instituted. What was discussed afterwards is patently irrelevant except insofar as it may illumine the parties' prior behavior. The record indicates that negotiator Rodriguez on June 15 stated, "Well, can we go ahead and agree to that, that that raise should go into effect?",

thereby indicating that the UFW was not unamenable to the immediate implementation of Dal Porto's proposed increase in wages.

I would conclude that by remaining silent in the face of petitioner's stated intent to impose a wage increase before the end of May, the UFW waived its right to complain.[3] I would therefore annul the Board's finding that the unilateral increase violated Labor Code section 1153, subdivisions (a) and (e).

My review of the whole record compels my conclusion that, on the primary issue of bargaining intent, the negotiating positions reflect simply a case of hard bargaining between two parties of disparate economic power. Dal Porto attempted to retain and the Union to gain as many rights as possible, desires "not inconsistent with its statutory duty to bargain in good faith. [Citation.]" (*N.L.R.B.* v. *Tomco Communications, Inc.* (9th Cir. 1978) 567 F.2d 871, 884.)

I would annul the decision of the Board finding petitioner committed unfair labor practices by bargaining in bad faith on the issues of Union security (dues checkoff) and successorship, and by unilaterally increasing wages, and that portion of the Board's order requiring Dal Porto to provide "make-whole" relief. (See Lab. Code, § 1160.3; *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 31 [160 Cal.Rptr. 710, 603 P.2d 1306].)

A petition for a rehearing was denied January 14, 1985. Evans, Acting P. J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied February 27, 1985. Bird, C. J., did not participate therein.

---

[3]*Caravelle Boat Co.* (1977) 227 N.L.R.B. 1355, and *Timken Roller Bearing Company* v. *N.L.R.B.* (6th Cir. 1963) 325 F.2d 746 [2 A.L.R.3d 868], cited by the UFW for the proposition that silence does not constitute waiver of the right to complain about changes, are factually inapposite.

In *Caravelle* the parties involved had stipulated that " '[N]o proposals of any type were made by [the company] to the Union during the negotiating sessions between such parties concerning the unilateral changes in wages and working conditions . . . .' " (*Id.*, at p. 1358; italics added.)