Filed 8/22/17; Certified for Publication 9/21/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VALLEJO POLICE OFFICERS ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF VALLEJO,<br><br>    Defendant and Respondent. | A144987<br><br>(Solano County<br>Super. Ct. No. FCS042492) |

The Vallejo Police Officers Association (VPOA) petitioned the superior court for a writ of mandate alleging that the City of Vallejo (City) engaged in bad-faith bargaining in violation of state law and then unilaterally imposed contract terms that impaired VPOA members' vested rights to retiree medical benefits that covered insurance premiums up to the full cost of a Kaiser health plan. The superior court denied the petition, concluding that VPOA had not shown its members had a vested right to the full Kaiser premium and that the City had not bargained in bad faith; the court therefore declined to order the City to start new contract negotiations or to reinstate retirement medical benefits at the level previously provided to VPOA members. We will affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Faced with ever-increasing employee and retiree costs that led to operating deficits and the depletion of its general fund reserves, the City filed a petition for bankruptcy relief in May 2008. At that time, under its existing labor agreement with the VPOA, the City paid the full premium cost for retirees and employees of any medical plan offered

1

through the California Public Employees' Retirement System (CalPERS or PERS) Health Plan Services Division. The City likewise paid the full premium for other City retirees. By virtue of offering medical benefits through CalPERS, the City is subject to PEMHCA (the Public Employees' Medical and Hospital Care Act; Gov. Code, § 22750 et seq.), which governs the CalPERS health benefit system. (See *Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1557, 1559-1560 [providing an overview of PEMHCA].) PEMHCA establishes a minimum level of employer contribution toward medical premiums, and generally requires the employer to contribute the same amount for employees and retirees. (Gov. Code, § 22892, subds. (b) & (c).)

In June 2008, the City filed a motion seeking approval from the bankruptcy court to reject its agreements with the VPOA and three other unions, and while the motion was pending, the City negotiated with the VPOA to modify the VPOA labor agreement. In late January 2009, before the scheduled hearing on the motion, the VPOA and the City reached agreement on a new contract (the January 2009 Supplemental Agreement, or 2009 Agreement), and the City voluntarily dismissed the bankruptcy court motion to reject as to the VPOA. (*In re City of Vallejo, CA* (E.D. Cal. 2010) 432 B.R. 262, 265-266.)

A.      *Health Insurance Provisions in the 2009 Agreement*

A central issue in this case is how to interpret the 2009 Agreement, under which health insurance benefits were reduced from full coverage for any CalPERS plan to coverage capped at 100 percent of the rate for coverage through Kaiser. The 2009 Agreement includes the following provisions for health insurance:

"[6.] A. Health Insurance[1]

"1. The City shall provide to all eligible employees, retiree-annuitants, and dependents, the PERS Health Benefits Program subject to the following restrictions.

"2. Effective January 1, 2010 and there after [sic], the City's direct PEMHCA contribution of medical premiums for employees and eligible dependents shall be the full premium cost of the chosen medical plan offered through PERS Health Plan Services Division, not to exceed the Kaiser Bay Area / Sacramento Area rate for each level of participation – single, single plus one dependent, single plus two or more dependents. For example, if the Kaiser family rate is $1000/month and an employee with family coverage chooses a plan costing $1500/month, the City will pay $1,000 (the Kaiser premium) and the employee will pay $500 (the difference between the selected plan and the Kaiser premium) each month.

"3. For employees hired on or before February 1, 2009, the City will contribute the same amount towards eligible retiree-annuitants' PEMHCA medical premiums as it contributes towards the PEMHCA medical premiums for current VPOA bargaining unit employees. *For example, if the City's direct PEMHCA contribution is capped at the Kaiser Bay Area / Sacramento Area rate for each level of participation, the City will pay up to that same amount for eligible retirees at each level of participation.* [(Italics added.)]

"4. With respect to retiree-annuitants hired on or after February 1, 2009, any benefit in excess of the PEMHCA statutory minimum will require ten (10) years of City of Vallejo service. Any employee hired before such date shall not be subject to the

---

[1] The 2009 Agreement replaced portions of the Health Insurance provisions in the then-existing contract between the City and the VPOA, and provided that "All other terms and conditions in the Pre-existing Labor Agreement . . . shall remain in full force and effect unless modified by this Supplemental Agreement." As a result, certain terms and conditions concerning health insurance remained in effect, including provisions specifying that "eligible retiree-annuitants" are retired City employees who "meet the requirements of PERS retirement" and who are members of the PERS Health Benefits Program at the time of retirement.

3

vesting requirement. This vesting requirement shall not apply to any employee who is granted a disability retirement. The benefit once vested will be the same as for retiree-annuitants hired before February 1, 2009 (the same as the amount of the City's PEMHCA contribution for current VPOA bargaining unit employees)."

The parties disagree about how to interpret paragraph 6.A.3, which concerns medical premiums for retirees who were hired before February 1, 2009. The City argues that paragraph 6.A.3 requires it to provide a retiree the same direct PEMHCA contribution it provides to an active employee. The VPOA argues that paragraph 6.A.3 requires the City to provide a retiree full premium coverage, up to 100 percent of the rate for coverage through Kaiser. Apparently, the parties' disagreement did not come to light until the time came to negotiate a replacement agreement, perhaps because both interpretations led to the same result while the 2009 Agreement was in effect: the total amount for medical premiums paid to an active employee was the full premium for the plan that the active employee selected, capped at the amount charged by Kaiser for coverage at the particular level of coverage (the Kaiser rate), and that amount was paid as a direct PEMHCA contribution. Accordingly, the retirement medical benefit during the term of the 2009 Agreement, for current employees and for existing retirees, was the full premium for the selected plan, capped at the Kaiser rate.

Under the 2009 Agreement, employees hired on or after February 1, 2009, are subject to a "vesting requirement" of 10 years of service with the City, pursuant to paragraph 6.A.4. Once that requirement is met, those new employees are entitled to retirement benefits in the amount provided to retirees who were hired before February 1, 2009.

The 2009 Agreement extended the VPOA's labor contract with the City to June 30, 2012 "and from year-to-year thereafter, unless either part[y] shall have given written notice to the other of its desire to amend or terminate the Agreement not less than six (6) months prior to June 30, 2012, or any subsequent anniversary date of the Agreement."

The City exited bankruptcy in 2011.

4

**B.**     *Replacing the 2009 Agreement*

Starting in June 2012, and continuing through December 6, 2013, representatives of the City and the VPOA had discussions and negotiations about a labor agreement to supersede the 2009 Agreement. From the beginning of the discussions, the City's negotiators told the VPOA that the City's top priority was to reduce its liability for retiree medical costs, and that the City would be seeking agreements with all its unions to reduce the City's retiree medical premium contribution to $300 per month. The reduction would be consistent with the "General Fund Five-Year Business Plan," which the City issued in November 2010 in the course of the bankruptcy, and which included "[r]etiree health cost projections" that assumed the City would be able to "negotiate and implement a $300 per month city-paid retiree health benefit for current and future retirees." The VPOA maintained that "each member hired prior to the effective date of an agreement, including retired members, maintains a vested right to his/her retirement medical benefit," and that therefore current employees and retirees had a vested right to retiree medical benefits capped at the Kaiser rate, as reflected in the 2009 Agreement.

After months of discussions and negotiations, the City declared impasse in September 2013 and gave its "last, best, and final offer" to the VPOA.[2] In October 2013, the VPOA filed a petition in the superior court for writ of mandate, declaratory relief and injunctive relief, alleging that the City was not bargaining in good faith and was therefore violating the Meyers-Milias-Brown Act (MMBA; Gov. Code, § 3500 et seq.).[3] The VPOA sought a declaration that its members had "a vested constitutional right to a defined retirement medical benefit that provides [them] an amount necessary to pay the entire cost of the member's retirement medical premium up to the cost of the [Kaiser rate]." The City filed a demurrer, which was set for hearing in February 2014.

---

[2] We describe the negotiations in section D.2 of the Discussion, below.

[3] The MMBA governs labor relations between public agencies, including cities and their employees. (Gov. Code, §§ 3500, 3501, subds. (c) & (d), 3501.5.)

5

In the meantime, despite further discussions and fact-finding, the parties could not reach agreement, and in December 2013, the City Council voted to approve staff recommendations that the City Council unilaterally impose some of the terms in the City's "last, best, and final offer" to the VPOA. The resolution adopted by the City in December 2013, and at issue in this case, imposed the following pertinent terms concerning health and welfare benefits:

"[-]    The City shall provide, during the applicable term,[4] to all eligible employees, retire-annuitants, and dependents, the PERS Health Benefits Program subject to the following restrictions[:]

"Effective January 1, 2014:

"[-]    **For active employees,** the City will contribute a ($300) PEHMCA contribution plus the difference between that and 75% of the [Kaiser rate] through a flexible benefits plan. The City's contribution through the flexible benefits plan shall be limited for use for medical premiums. The employee shall be responsible for any premium cost in excess of the total City contributions set forth above.

"[-]    **For eligible retiree-annuitants,**[5] upon retirement effective on or after January 1, 2014, for annuitants who were hired on or prior [sic] December 31, 2013, City shall pay a direct PEMHCA contribution of up to $300, the city will pay up to that same amount for eligible retirees at each level of participation. [sic] . . . [¶] . . . [¶] . . .

"[-]    For existing eligible retiree annuitants who retired prior to the effective date of this resolution, with a 3% @50 pension formula, the City shall pay $300 per month. For existing eligible retiree annuitants who retired prior to the implementation of a 3% at 50 pension formula, the City shall pay $300 plus the difference between that and 75% of the [Kaiser rate].

---

[4] The City Council adopted these terms and conditions of employment for the 2013-2014 fiscal year.

[5] As under the previous agreements, eligible retiree-annuitants are retired City employees who "meet the requirements of PERS retirement" and who are members of the PERS Health Benefits Program at the time of retirement.

6

"[-]  **Employees first hired on or after January 1, 2014** shall receive retiree medical benefits in the form of an individual account with a Voluntary Employee Beneficiary Association . . . ."

Under these terms, the City pays a total of 75 percent of the Kaiser rate each month for active employees, with $300 paid as a PEMHCA premium and the remainder paid through a flexible benefits plan. For retirees, except for those who retired before the implementation of the "3% at 50" formula, the City pays $300 each month.[6] Retirement medical benefits for employees hired on or after January 1, 2014, are not at issue in this appeal.

## C.    *Proceedings in the Superior Court*

In January 2014, the VPOA filed its first amended verified petition for writ of mandate, alleging four causes of action arising from its allegations that its members had a vested constitutional right to a defined retirement medical benefit of City-paid healthcare premiums equal to the Kaiser rate and that the City had negotiated in bad faith to replace the 2009 Agreement by (among other things) declaring impasse as a result of the VPOA's refusal to accept terms that impair VPOA's members' vested rights. The VPOA sought a writ of traditional mandate requiring the City to comply with Article I, Section 9 of the California Constitution, which prohibits any law impairing the obligation of contracts (First Cause of Action) and declaratory relief affirming their vested right (Third Cause of Action). The VPOA also sought a writ of traditional mandate ordering the City to comply with the MMBA (Second Cause of Action). And the VPOA alleged that under the doctrine of promissory estoppel the City was required to continue to provide medical premium benefits to retirees and their dependents, because the VPOA's members "were promised" that benefit and reasonably relied on the promise to their detriment in

---

[6] The parties do not discuss the significance of the fact that VPOA members who retired before the implementation of the "3% at 50" formula, receive a medical benefit equivalent to the benefit for active employees: 75 percent of the Kaiser rate.

7

accepting employment or remaining employed by the City, as the City knew they would (Fourth Cause of Action).[7]

The case was tried on written briefs supported by declarations. The VPOA argued that the City had not bargained in good faith and had violated the MMPA by engaging in "surface bargaining" and by rushing to declare impasse; that VPOA members had a vested, constitutional right to retirement medical benefits equal to the Kaiser rate; and that the City should be estopped from denying the existence of VPOA members' vested right.

After oral argument, the trial court denied the VPOA's petition, concluding that while the terms of the 2009 Agreement did "not clearly reserve [the City's] right to reduce the level of medical benefits in [labor agreements] covering periods beyond the term of the [2009 Agreement], they do inject enough uncertainty such as to preclude a finding by this court . . . that VPOA has met its 'heavy burden' of making a 'clear showing' of the intent to provide medical benefits at the full amount of the 2010 [Kaiser rate]." The court ruled that the "clear showing" requirement is substantially similar to the "clear promise" element of promissory estoppel, which precluded a finding promissory estoppel as to the Kaiser rate. As to the MMBA cause of action, the court found "an insufficient basis for concluding that [the City] engaged in 'surface bargaining', or 'rushed to declare impasse.' " The VPOA timely appealed.

### DISCUSSION

**A.** *Standard of Review for Writs of Mandate*

"A traditional writ of mandate under Code of Civil Procedure section 1085 is a method for compelling a public entity to perform a legal and usually ministerial duty. (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53.) The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary

---

[7] The trial court sustained the City's demurrer to two additional causes of action without leave to amend.

8

support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires. (*Kreeft* [*v. City of Oakland*], *supra*, at p. 53; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387.) 'Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. [Citation.] In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]' (*Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799.)

" 'In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's factual findings.' (*Kreeft v. City of Oakland*, *supra*, 68 Cal.App.4th at p. 53.) Thus, foundational matters of fact are conclusive on appeal if supported by substantial evidence. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169-1170.) However, we exercise our independent judgment about legal questions. (*Kreeft* [*v.City of Oakland*], *supra*, at p. 53; *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700.)" (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995-996, fn. omitted.)

**B.      *Vested Right to the Full Kaiser Rate under the 2009 Agreement***

We begin with the VPOA's argument that the trial court erred in ruling that the 2009 Agreement did not give VPOA members a vested right to retiree medical benefits at the full Kaiser rate.[8]

1.      *Applicable Law*

"Under the [MMBA], local governments are authorized to meet and confer with their employees' authorized bargaining representative regarding wages, hours, and other

_____

[8] The VPOA frames the issue for review as whether the City unconstitutionally impaired its members' vested right to those benefits. Because we find no error in the trial court's conclusion that the members had no vested right to those benefits, we do not reach the question of impairment.

terms and conditions of employment, and to enter into and approve written memoranda of understanding to memorialize their agreements." (*Retired Employees Association of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1182 (*REAOC*).) These memoranda of understanding (MOU's) can be enforced as contracts. (*Id.* at p. 1182-1183.) Absent any statutory prohibition, MOU's, like other contracts, can have implied terms. (*Id.* at p. 1176.) The implied terms cannot be " 'at variance with the terms of the contract as expressly agreed or as prescribed by statute.' (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 412, italics omitted . . . .)" (*Id.* at p. 1181.)

Like other contracts, MOU's ordinarily cover distinct periods of time, and the obligations associated with them ordinarily terminate with the agreement. (*Litton Financial Printing Div., a Div. of Litton Business Systems, Inc. v. N.L.R.B.* (1991) 501 U.S. 190, 207 (*Litton*).) A party asserting that contract rights are survive the contract term (that is, that the rights are vested rights) must overcome the presumption that an MOU does not create such rights. (*REAOC*, *supra*, 52 Cal.4th at pp. 1185-1186.) Overcoming the presumption against vested rights requires a "clear showing" of the intent of the parties to create such a right from "a clear basis in the contract or convincing extrinsic evidence." (*Id.* at pp. 1188-1189, 1191.) The "clear showing" requirement "ensure[s] that neither the governing body nor the public will be blindsided by unexpected obligations."[9] (*Id.* at pp. 1188-1189.)

---

[9] The City cites the United States Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett* (2015) ___ U.S. ___ [135 S.Ct. 926, 935-936] for the proposition that clear and express language is required to overcome the presumption that benefits will not continue after the agreement's expiration. In *M&G Polymers* the Supreme Court explained that collective bargaining agreements are interpreted according to ordinary principles of contract law, and that the parties' intentions control. (*Id.* at p. 933.) Under those principles, a court may not infer that retiree benefits vest for life from a contract's silence as to the duration of those benefits. (*Id.* at p. 937.) However, *M&G Polymers* says nothing to prohibit the use of extrinsic evidence to determine the parties' intent, and says nothing to undermine the Supreme Court's earlier observation that " '[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement' . . . may be derived from the agreement's 'explicit terms,' but they 'may arise as well

The existence of a vested right is a question of law subject to our independent review. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1129.) We apply the general rules of contract interpretation to a labor agreement between a city and its employees absent any contrary provision in the Civil Code. (*REAOC, supra*, 52 Cal.4th at pp. 1178-1179.) We determine de novo the meaning of the 2009 Agreement and its adoption by the City Council to the extent there is no conflicting extrinsic evidence as to its meaning. (*Santa Clara County Correctional Peace Officers' Association, Inc. v. County of Santa Clara* (2014) 224 Cal.App.4th 1016, 1027.) However, to the extent the interpretation of the 2009 Agreement turns on the resolution of conflicting extrinsic evidence, we defer to the trial court's interpretation if it is supported by substantial evidence. (*Beverly Hills Firemen's Association, Inc. v. City of Beverly Hills* (1981) 119 Cal.App.3d 620, 629.)

2. *Analysis*

The effect of the 2009 Agreement was to provide fully-paid retiree medical premiums capped at the Kaiser rate. The VPOA argues that the language of the 2009 Agreement and extrinsic evidence show that the benefit, in the amount of the full Kaiser rate, survived the expiration of the 2009 Agreement, such that any employee hired before February 1, 2009, is entitled to that benefit as a retiree. The VPOA also argues that any employee hired on or after February 1, 2009, is entitled to that benefit as a retiree if the employee is on active status for 10 years, or is granted a disability retirement.

We conclude that the language of the 2009 Agreement does not provide a vested right to a retiree medical benefit at the full Kaiser rate, and that substantial evidence supports the trial court's conclusion that the VPOA did not prove that convincing extrinsic evidence establishes that the parties intended the 2009 Agreement to provide that vested right.

from . . . implied terms of the expired agreement.' " (*Id.* at p. 938 (conc. opn. of Ginsburg, J., quoting *Litton, supra,* 501 U.S. at pp. 203, 207).)

11

a.     *The Contract Language*

The 2009 Agreement by its terms was in effect from February 1, 2009 through June 20, 2012, and from year to year after that, absent six months' advance notice by either party of a desire to amend or terminate it.  As we set out above,[10] the 2009 Agreement describes retiree medical benefits for then-existing employees and retirees in paragraph 6.A.3, and for employees hired on or after February 1, 2009, in paragraph 6.A.4.  Even though both paragraphs include language that might indicate the parties' intent that some retiree medical benefit will continue beyond the term of the 2009 Agreement and be tied to the medical benefit provided to active employees, the language is clear that any such benefit would not necessarily extend to the full Kaiser rate.

Under the 2009 Agreement, retirees receive a medical benefit of PEMHCA premiums in the same amount as active employees.  The intent that this benefit will extend beyond the term of the 2009 Agreement is arguably reflected in the inclusion of an example:  "For example, if the City's direct PEMHCA contribution is capped at the [Kaiser rate] for each level of participation, the City will pay up to that amount for eligible retirees at each level of participation."  Because the 2009 Agreement is unambiguous that the Kaiser rate cap applies to PEMHCA contributions for active employees throughout the term of the 2009 Agreement, the fact that the agreement includes an "example" that begins with "if" to show how the benefit is to be calculated could lend support to an interpretation that the retiree medical benefit extends beyond the term of the 2009 Agreement, as the VPOA argues.  But if it does support that interpretation, it also shows that the amount of the retiree medical benefit will *not* necessarily be the full Kaiser rate after the 2009 Agreement expires, contrary to the VPOA's position.

Further, under the 2009 Agreement, employees hired on or after February 1, 2009, are subject to a "vesting requirement" of 10 years employment before they may receive any benefit in excess of the statutory minimum PEMHCA contribution.  The 2009

---

[10] See section A of the Factual and Procedural Background.

12

Agreement states that once the benefit is vested for these new employees, the benefit will be the same as for retirees who were hired before February 1, 2009, which is once again described as the same amount as the City's PEMHCA contribution for active employees. The fact that the 2009 Agreement describes benefits that would not vest or be paid within the term of the agreement could lend support to an argument that the benefits for new employees extend beyond the term of the 2009 Agreement. And the fact that the retirement benefits for new employees are defined by reference to benefits for existing retirees and employees could provide further support to an argument that the benefits for existing retirees and employees extend beyond the term of the 2009 Agreement.

The VPOA, however, argues not only that the contract language shows that retirement benefits continue beyond the term of the 2009 Agreement, but also that the language shows that those benefits will always extend to the full Kaiser rate. We are not persuaded. The VPOA argues that the language in paragraph 6.A.2 of the 2009 Agreement providing medical benefits for active employees in the form of a PEMHCA contribution at the full Kaiser rate "[e]ffective January 1, 2010 and there after," combined with language in paragraphs 6.A.3 and 6.A.4 linking retiree medical benefits to active employee medical benefits, means that the right to retiree medical benefits *at the Kaiser rate* extends beyond the expiration of the agreement. The VPOA analogizes the phrase "and there after" in the 2009 Agreement to the phrase "in the future," which was included in the MOU at issue in *International Brotherhood of Electrical Workers v. City of Redding* (2012) 210 Cal.App.4th 1114 (*Redding*). There, the Court of Appeal concluded that "language in . . . MOUs promising payment of 50 percent of the medical insurance premiums 'for each retiree in the future' . . . was a sufficiently clear showing, for pleading purposes, that . . . the ratification of the MOUs by the city council [ ] was intended to create an obligation that survived the expiration of the MOUs." (*Id.* at pp. 1120-1121.)

But in *Redding* the language allegedly conferring the vested right was not limited to the phrase " 'in the future.' " The pertinent phrase was " 'each retiree in the future.' " (*Redding*, *supra*, 210 Cal.App.4th at p. 1120.) Here, in contrast, the phrase "and there

13

after" appears only in paragraph 6.A.2, in connection with medical benefits for active employees, and is not included in the paragraphs describing retiree medical benefits.

Also, in *Redding* the court concluded that if the parties had intended the medical insurance premium benefit to apply only during the term of the MOU, the phrase " 'in the future' " would be surplusage. (*Redding*, *supra*, 210 Cal.App.4th at p. 1120.) VPOA makes a similar argument for the phrase "and there after" in the 2009 Agreement and the continuation of a benefit at the Kaiser rate in the 2009 Agreement. But when we look at the 2009 Agreement as a whole, the VPOA's argument loses its force. Rather than being surplusage, the phrase "and there after" clarifies that the Kaiser rate benefit, which becomes effective January 1, 2010, continues through the entire remaining term of the 2009 Agreement. Some provisions of the 2009 Agreement, specifically the provisions concerning salary, are subject to change during the term of the agreement. Those provisions are introduced with the phrases "Effective July 1, 2008," "Effective July 1, 2009," "Effective July 1, 2010," and "Effective July 1, 2011." By contrast, the phrase "Effective January 1, 2010 and there after," in connection with medical benefits emphasizes that the medical benefit that takes effect January 1, 2010, does not change during the remainder of the term.

In sum, we conclude that the language of the 2009 Agreement does not explicitly confer a vested right to retiree medical benefits in the amount of the Kaiser rate, nor does it provide a clear basis for implying such a vested right.

        b.    *Extrinsic Evidence*

        i.    *The Parties' Previous Agreements and Bargaining History*

The VPOA argues that the parties' agreements before 2009 and their bargaining history back to 1988 show that "an implied term of the [2009 Agreement] require[s the City] to provide VPOA members fully-paid retiree medical benefits (capped at the Kaiser Rate) notwithstanding the expiration of the 2009 Agreement." The trial court stated that because the City's bankruptcy "creates some uncertainty as to the continued enforceability of contracts entered into by the City prior to that filing," it would not rely on the parties' earlier agreements. The VPOA argues that the trial court erred in

14

excluding the parties' earlier agreements and bargaining history from evidence. Assuming, without deciding, that the VPOA can show error by the trial court, the VPOA nevertheless fails to show that any error was prejudicial.

The VPOA does not identify any explicit language in the parties' previous MOU's that created a vested right to retiree health benefits of full payment for medical premiums. Instead, the VPOA argues that when negotiations for the 2009 Agreement began, its members had a long-standing vested right to retiree medical contributions in an amount sufficient to pay the full cost of health insurance premiums. The VPOA claims this vested right arises from a 1988 arbitration award that endorsed an approach to health benefits that required the City "to provide retirees, like employees, with enough contribution to provide a fully paid, basic [health] plan" and is reflected in 1988 and 1996 City resolutions to increase health plan contributions for retirees until they equaled the contributions for employees. In other words, the VPOA argues that the vested nature of the right in the earlier MOUs was implied and then imported (by implication) into the 2009 Agreement for retiree medical benefits because nothing in the 2009 Agreement or the bankruptcy proceeding altered the vested nature of the right.

This argument is not persuasive for two reasons. First, the VPOA does not identify any language in the 1988 arbitration award or the 1988 and 1996 resolutions demonstrating a clear intent that full coverage for a basic health plan for retirees or identical treatment for retirees and employees, once achieved, would be maintained forever. Second, any vested right to a retiree health benefit that provided full coverage of medical premiums was eliminated by the 2009 Agreement, in which VPOA and the City agreed to change that benefit.

ii.      *Subjective Understandings of the Parties' Intent*

The VPOA argues that declarations of the individuals who signed the 2009 Agreement as representatives of the parties constitute evidence of the parties' intent to provide a vested retiree health benefit at the Kaiser rate. We disagree. These declarations, prepared for the trial on the merits, state the declarants' own subjective understanding that they understood the 2009 Agreement preserved VPOA members'

15

vested right to receive a fully-paid retirement medical benefit at the Kaiser rate. These statements, however, are irrelevant to the issue before us. As the trial court explained, the City's intent determines the rights, express or implied, created by the 2009 Agreement. (*REAOC*, *supra*, 52 Cal.4th 1171.) Therefore, statements made by City staff or others to the City Council prior to its approval of the 2009 Agreement would be admissible as evidence of the City's intent. But the VPOA does not identify any statement made to or by the City Council in the course of its approval of the 2009 Agreement that constitutes clear evidence that the City Council intended to confer a vested right to the full Kaiser rate. As the trial court correctly observed, citing *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1240, "statements such as 'all parties understood . . .' are, without foundational evidence in support, merely conclusory and argumentative statements that add nothing to the court's interpretation of those terms." The subjective understandings of individuals, as well as understandings communicated outside the approval process, are not admissible as evidence of the City's intent. (*Aguiar v. Superior Court* (2009) 170 Cal.App.4th 313, 326, fn. 7.)

### iii. *Negotiations for the 2009 Agreement*

Substantial evidence supports the trial court's conclusion that the VPOA failed to show that the negotiations over the 2009 Agreement constitute convincing evidence of a vested right to the full Kaiser rate.

The City began negotiating with VPOA to modify the existing labor agreement in September 2008. The City sent the VPOA an initial proposal in which paragraphs 5 and 6 addressed medical benefits:

"5. **HEALTH AND WELFARE BENEFITS**

"Commencing January 1, 2010 City medical benefits shall be provided by a comprehensive medical and flexible benefit plan developed in conjunction with the City's designated employee organizations providing for caps on the City's contribution toward employee and medical premiums at current levels of coverage. The initial dollar value of the cap would be Kaiser North rate at each level (i.e., employee only, employee

16

plus one, or employee plus two or more) effective January 1, 2010. Subsequent dollar changes to the cap would be subject to negotiations and not tied to an automatic escalator in the Kaiser North rate.

"6. **RETIREE HEALTH**

"[-]    Current retirees grandfathered (i.e., they get full payment of medical) but they are capped at the Kaiser North rate for whatever plan level (single, retiree plus one, or family) they are in at City Council adoption of the new agreement.

"[-]    Current employees grandfathered (i.e., they get full payment of medical) but they are capped at the Kaiser North rate for the plan level (single, retiree plus one, or family) they are in at retirement."[11]

The VPOA rejected the City's initial proposal, the parties engaged in negotiations, and on January 5, 2009, the parties reached a tentative agreement. The City prepared a term sheet, which was provided to the VPOA and the City Council. With respect to medical benefits, the term sheet stated only, "1/1/10 – Capped at Kaiser North rate for each level (actives plus retirees)."

On January 13, 2009, the City sent a draft agreement to the VPOA. It stated that for active employees, the amount of the City's contribution effective January 1, 2010, would be limited to the Kaiser rate for the level of coverage. The draft stated that, "[c]urrently the City contributes towards the cost of health care premiums for eligible retiree-annuitants per [PEMHCA]," and proposed that for eligible retirees, the amount of the City's contribution would contribute "the same as the amount of the City's PEMHCA contribution" for active employees. The City proposed that for new hires, retiree benefits

---

[11] The parties dispute the significance of the term "grandfathered" in the City's proposal. A declarant for the VPOA states that "all parties understood that the reference to 'grandfather' the retirement medical benefits of certain classes of individuals meant that the fully paid retirement medical benefit would be preserved and maintained in perpetuity." A declarant for the City states that the City used the word "grandfather" "to mean the benefit would be retained under the new labor agreement, not that it would be maintained in perpetuity as it existed in that agreement."

17

would be limited to the statutory maximum until they served at least 10 years, at which point they would have the same retiree medical benefits as other retirees.

VPOA sent edits to the draft two days later. The trial court concluded that the VPOA's proposed revision arguably guaranteed funding for the full Kaiser rate in perpetuity, but emphasized that the City did not accept the VPOA's edits. Instead, on January 17, 2009, the City proposed language tying retiree benefits to the City's PEMHCA contribution for active employees, and that language was incorporated in the 2009 Agreement.

The City's rejection of the VPOA-proposed language that could be read to provide a vested right to the full Kaiser premium, and the inclusion instead in the final agreement of language the City proposed constitutes substantial evidence that the negotiating history of the 2009 Agreement does not show an intent by the City to provide a vested right to a retiree medical benefit at the full Kaiser rate.

#### iv. *Other Extrinsic Evidence*

The VPOA contends that the City's "uninterrupted history" of paying the full cost of retiree medical premiums constitutes extrinsic evidence of the existence of a vested right to that level of benefit. This argument, unsupported by any citation to authority, lacks merit. "[A] practice or policy extended over a period of time does not translate into an implied contract right without clear legislative intent to create that right." (*Retired Employees Association of Orange County, Inc. v. County of Orange* (9th Cir. 2014) 742 F.3d 1137, 1142, citing *REAOC*, *supra*, 52 Cal.4th at pp. 1186-1187.) Accordingly, the fact that the City paid the full cost of retiree medical premiums over a period of years does not imply a right that such payments will continue, absent a showing of legislative intent.

The VPOA argues that after the 2009 Agreement was implemented, the City informed employees they would receive fully-paid medical benefits upon retiring, but the VPOA does not identify any such statements made by the City or by any individual authorized to bind the City. Instead, the VPOA relies on a PowerPoint presentation to the City Council by the "City's representatives" at the meeting where the 2009 Agreement

18

was approved. The presentation describes the 2009 Agreement as providing medical benefits for active employees and retirees at the Kaiser rate effective January 1, 2010, but says nothing to indicate that the benefits will extend beyond the term of the contract. The VPOA also relies on declarations from individuals who testified to their understanding of promises that employees would receive fully-paid medical benefits after they retired, but the VPOA provides no evidence of any specific promise, much less evidence of a promise made by a person authorized to bind the City. As a result, the VPOA's citation to *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809 is unavailing. There, express promises made by a state university on its website and in its catalogues promising not to raise certain fees were held to be terms of implied contracts. (*Id.* at pp. 828-829, 831.)

Nor are we persuaded by the VPOA's argument that the City's November 2009 Resolution 09-275 confirms the City's intention to provide retirees with the full Kaiser rate beyond the term of the 2009 Agreement. The resolution says that, effective January 1, 2010, the City's PEMHCA health plan contribution for employees and retirees would be "the amount necessary to pay the full cost of . . . enrollment . . .in a health benefit plan up to a maximum of the [Kaiser rate] for each level of coverage."[12] This is an accurate description of the benefit provided by the 2009 Agreement, but does not state or imply that the contribution will continue at that level in perpetuity. Moreover, this resolution is itself a modification of a previous resolution, and nowhere states that it cannot be modified.

In sum, the trial court did not err in ruling that VPOA did not meet its burden to show "a clear basis" in the 2009 Agreement or "convincing extrinsic evidence" (*REAOC*, *supra*, 52 Cal.4th at p. 1191) of a vested right to retiree medical benefits in the full amount of the Kaiser rate.

---

[12] Under PEMHCA, the City's contribution is to be "fixed from time to time by resolution of the governing body of the agency." (Gov. Code, § 22892, subd. (a).)

19

### c.     *The VPOA's New Argument on Appeal*

The VPOA argues for the first time on appeal that paragraph 6.A.3 requires the City to provide a retiree the same total amount for medical premiums that it provides for an active employee, and that even if its members do not have a vested right to a retirement benefit in the amount of the full Kaiser rate, they nevertheless have a vested right to receive the same total amount dedicated to medical premiums that they would receive as active employees, and the benefit is not limited to the amount paid as a direct PEMHCA contribution for active employees.[13]  The VPOA concedes that this argument is new, but argues that it is "derivative" of its primary argument and was therefore somehow implicitly raised below.  The City argues that the VPOA has forfeited this argument for purposes of appeal, and we agree.

The VPOA's writ petition was premised on the claim that the 2009 Agreement provided a vested right to retiree medical benefits "equal to the cost of the Kaiser health plan."  The VPOA sought a declaration to that effect.  The VPOA cannot now advance a new theory of its case.  "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal; and it also reflects principles of estoppel and waiver."  (Eisenberg et al., Cal. Practice Guide:  Civil Appeals & Writs (The Rutter Group 2016) ¶ 8:229, pp. 8-172 – 8-173, italics omitted.)

---

[13] The City contends that the 2009 Agreement requires it to provide a retiree a medical benefit that is equal to the direct PEMHCA contribution it would make if the employee were not retired.  Under the December 2013 resolution, this amount is $300, but active employees receive additional medical benefits in the form of payments to a flexible benefit plan.  The VPOA argues on appeal that the City cannot "avoid its obligation to provide matching contributions by splitting the actives' PEMHCA contribution," that is, by providing active employees a medical benefit partly as a direct PEMHCA contribution and partly through a flexible benefit plan.  The VPOA does not contend that the City violates PEMHCA's equal contribution rules by splitting active employees' benefits.

We are not persuaded by the VPOA's contention that its new argument is "derivative" of its argument below. In the trial court, the VPOA took the position that the 2009 Agreement provided a vested retirement medical benefit at the full Kaiser rate, which was *more* than the medical benefit provided for active employees under the December 2013 resolution. The VPOA argued that contract language and extrinsic evidence demonstrate the existence of this vested right. It is not clear how that argument leads to, or is even compatible with, the VPOA's new argument that the very same contract language and extrinsic evidence also demonstrate the existence of a different vested right—the right to the *same* benefit as active employees.[14]

## C.    *Promissory Estoppel*

The trial court declined to rule that the City was estopped from denying a promise to provide retiree medical benefits at the full Kaiser rate, explaining that the "clear promise" element of promissory estoppel is substantially similar to the "clear showing" required to establish a vested right and citing *Poway Royal Mobilehome Owners Association v. City of Poway* (2007) 149 Cal.App.4th 1460, 1471. Thus, the trial court's ruling on the VPOA's promissory estoppel claim followed from its determination that the VPOA did not demonstrate a vested right to retirement medical benefits at the full Kaiser rate.

Because the promissory estoppel claim is derivative, we can dispose of it quickly. The VPOA argues that by meeting the "clear showing" requirement it has demonstrated the existence of a clear promise. From our conclusion that the trial court did not err in ruling that the VPOA failed to meet the clear showing requirement with respect to benefits at the full Kaiser rate, we necessarily conclude that the trial court did not err in ruling that the promissory estoppel claim had no merit.

---

[14] The VPOA states that its new argument raises purely legal issues, and invites us to exercise our discretion to address them on appeal even though they were not addressed below. Assuming that the VPOA's statement is accurate, we decline the invitation.

**D.** *Violations of the MMBA*

We turn now to the VPOA's argument that the trial court erred in rejecting the VPOA's claims that the City engaged in surface bargaining and rushed to declare impasse and bargained in bad faith to replace the 2009 Agreement.[15]

1. *Applicable Law*

"The MMBA imposes on local public entities a duty to meet and confer in good faith with representatives of recognized employee organizations, in order to reach binding agreements governing wages, hours, and working conditions of the agencies' employees." (*Coachella Valley Mosquito and Vector Control Dist. v. Public Employment Relations Board* (2005) 35 Cal.4th 1072, 1083, citing Gov. Code, § 3505.)

"The question of good or bad faith is primarily a factual determination based on the totality of the circumstances [citations] and therefore on appeal the trial court's finding must be upheld if it is supported by the record as a whole." (*Placentia Fire Fighters v. City of Placentia* (1976) 57 Cal.App.3d 9, 25 (*Placentia*).) "In general, good faith is a subjective attitude and requires a genuine desire to reach agreement. [Citations.] The parties must make a serious attempt to resolve differences and reach a common ground. [Citation.] The effort required is inconsistent with a 'predetermined resolve not to budge from an initial position.' " (*Id.* at pp. 25-26.) This does not mean that the MMBA imposes on employers a duty to agree. (*Id.* at pp. 22-23.)

An " 'employer may have either good or bad reasons, or no reason at all, for insistence on the inclusion or exclusion of a proposed contract term. If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. . . . [¶] The obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained. . . . [¶] On the other hand, while the employer is assured these valuable rights, he may not use them as a

---

[15] The VPOA also argues that the City violated the MMBA by insisting to impasse that the VPOA waive members' legal rights, but concedes that its argument depends on the existence of a vested right to premium contributions in the amount of the Kaiser rate. Because we conclude that there was no such vested right, we do not reach this argument.

cloak. In approaching it from this vantage, one must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere "surface bargaining," or "shadow boxing to a draw," or "giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining." ' " (*Placentia*, *supra*, 57 Cal.App.3d at p. 23, quoting *N.L.R.B. v. Herman Sausage Co.* (5th Cir. 1960) 275 F.2d 229, 231-232.)

A negotiating party is entitled to stand on its position on a particular issue, and therefore to engage in "hard bargaining." (*William Dal Porto & Sons, Inc. v. Agricultural Labor Relations Board* (1984) 163 Cal.App.3d 541, 549 (*Dal Porto*) [" 'hard bargaining' . . . is found where a party genuinely and sincerely insists on provisions that the other party deems unacceptable, even though it may produce a stalemate"].) The Public Employment Relations Board (PERB), has found an employer to engage in hard bargaining, as opposed to refusing to bargain, where its position is supported by rational arguments that were communicated to the union during the course of negotiations. (*Regents of the University of California* (2010) PERB Dec. No. 2094-H [34 PERC ¶ 41, pp. 190-191] (*Regents 2010*).)[16]

An "impasse exists where the parties have 'considered each other's proposals and counterproposals, attempted to narrow the gap of disagreement and have, nonetheless, reached a point in their negotiations where continued discussion would be futile.' " (*Regents of the University of California* (*SUPA*) (1985) PERB Dec. No. 520-H [9 PERC ¶ 16207, p. 887] (*SUPA*).) "Those who bargain collectively are normally under an obligation to continue negotiating to impasse on all mandatory issues. [Citation.] The law relieves them of that duty, however, when a single issue looms so large that a

---

[16] Courts may look to PERB decisions for guidance. (See *Burke v. Ipsen* (2010) 189 Cal.App.4th 801, 809.)

stalemate as to it may fairly be said to cripple the prospects of any agreement." (*N.L.R.B. v. Tomco Communications, Inc.* (9th Cir. 1978) 567 F.2d 871, 881.) Thus, "impasse may exist when the parties are deadlocked on one or several major issues, even if the parties continue to meet and even if concessions on minor issues are possible." (*SUPA*, *supra*, PERB Dec. No. 520-H [9 PERC ¶ 16207, p. 888].) A premature declaration of impasse would support a finding of bad faith. (*Kings In-Home Supportive Services Public Authority* (2009) PERB Dec. No. 2009-M [33 PERC ¶ 52, p. 237].)

2.       *Additional Background*

In June, July and September 2012, representatives of the City and the VPOA had a total of four "off the record" discussions about a labor agreement that would supersede the 2009 Agreement. From the outset, the City's negotiators told the VPOA that the City's top priority was to reduce its liability for retiree medical costs, and that the City sought agreements with all its unions to reduce the City's retiree medical premium contribution to $300 per month, consistent with the November 2010 business plan.

In October 2012 the City made an initial written proposal to the VPOA. The City proposed reducing its PEMHCA contribution for active employees to $300 per month. The City proposed contributing an additional $600 to active employees through a "Section 125 Cafeteria/Health Benefits Account," to be "used for any purpose permitted by a Section 125 plan including health premiums and co-pays, dental premiums and co-pays, and other qualified benefits." The City also proposed that any retiree who was hired on or before July 1, 2013 would receive "$300 per month as the City's contribution towards medical premiums." The proposal included additional cost-saving measures as well, and the City explained it did not seek agreement on every possible cost-saving measure in the proposal, and was proposing more savings than needed in order to provide alternative ways to achieve the savings the City was seeking. Although the discussion here focuses solely on negotiations concerning medical benefits, other issues were being negotiated at the same time.

The parties held three formal negotiating sessions starting in January 2013, before exchanging proposals at a session in February. Two further negotiating sessions took

place in March. At the second of those, the VPOA made a "package proposal" under which the City would pay 80 percent of health care premiums for current VPOA members, including both active employees and retirees. In April, the City modified its proposals in response to the VPOA's proposal. "[O]ff the record" discussions followed in late April and early May, with formal negotiations resuming on May 5.

After formal sessions in mid-June and early July, the parties met in mid-July and the VPOA presented a counterproposal stating that "each member hired prior to the effective date of an agreement, including retired members, maintains a vested right to his/her retirement medical benefit." Notwithstanding that asserted right, the VPOA proposed that the City pay 75 percent of Kaiser rate for retirees, with the City's contribution to be offset in part by members' contributions to a trust of 3 percent of their base pay. The City then had "off the record" discussions with VPOA representatives on eight different dates in August and early September. The VPOA did not change its position regarding vested rights to retirement medical benefits.

On September 19, 2013, the City's negotiator declared an impasse in negotiations, and provided VPOA with the City's last, best, and final offer, in which the City offered the following, effective January 1, 2014: For active employees, the city would make a "direct PEMHCA contribution" of medical premiums not to exceed $300 per month, and would "contribute the difference between the PEMHCA contribution ($300) and 75% of the [Kaiser rate] through a flexible benefits plan," with the flexible benefit plan contribution "limited for use for medical premiums." As retirees, current VPOA members would receive the "same amount" as the City contributed "towards the PEMHCA medical premiums for current VPOA bargaining unit employees," so if the "direct PEMHCA contribution" for current employees was capped at $300, the City would pay up to that amount for eligible retirees. The proposal was accompanied by a letter in which the City wrote, "Despite the substantial movement in the City's [last, best, and final offer], we have no illusions that this proposal will result in an agreement. The VPOA made it clear in its last offer on July 18, 2013, that it believes 'The VPOA specifically notes that each member hired prior to the effective date of an agreement,

25

including retired members, maintains a vested right to his/her retirement medical benefit. Nothing in this proposal shall be interpreted to constitute a waiver of such members' individual vested rights.'  As we have communicated to you, the City does not believe that a vested benefit exists today for VPOA members.  Moreover, having recently exited the Chapter 9 bankruptcy process, the city will not consent to any language which would establish a long term, unrestricted, unknown growth of an employee or retiree benefit. [¶] Based on the foregoing, the City believes that the parties are now at impasse.  While we remain open to a counterproposal from the VPOA which breaks that impasse, the parties have been very frank in their needs over the past few months and we remain significantly apart."

Between September 30 and October 15, 2013, the City and the VPOA had four further "off the record" discussions.  On October 15, the VPOA filed a verified petition for writ of mandate, declaratory relief and injunctive relief in the superior court.  A few days later, the VPOA demanded that outstanding issues be submitted to formal factfinding pursuant to Government Code section 3505.4.[17]  The factfinding hearing was held on November 14 and 15, 2013, and the factfinding panel released a written report and recommended terms of settlement on November 30.

In the meantime, the parties had another "off the record" discussion in late October. On November 11, the VPOA presented a counterproposal to the City's last, best, and final offer, in which the VPOA maintained its position as to vested rights, and proposed that for active employees the City pay 75 percent of the Kaiser rate, as a direct contribution or as a flexible benefits contribution; for retirees hired before February 1, 2009, the City pay "the greater of 100% of the least expensive premium among the [CalPERS] plans provided in the Bay Area/Sacramento options, or 66.7% of the [Kaiser rate]."  Retirees hired between February 1, 2009 and the ratification of the new agreement

_____

[17] The MMBA requires a public agency to participate in factfinding upon request by the union when an impasse has been declared.  (Gov. Code, § 3505.4, subd. (a).)  The factfinding panel's findings of fact and recommended terms of settlement are "advisory only."  (Gov. Code, § 3505.5, subd. (a).)

26

would receive the minimum PEMHCA contribution if they retired with less than 10 years of service. With 10 years of service, they would receive the same benefits as retirees hired before February 1, 2009. The VPOA proposed that the benefit be funded by a trust to which the City and employees would contribute, with employees contributing 3.5 percent of their base salary. On November 12, 2013, the City modified its proposal to the VPOA in some respects, but did not change its position on medical benefits.

The factfinding panel took no position on the merits of the VPOA's argument regarding its members' vested rights to medical benefits. The panel issued a total of 16 recommendations on a range of contested issues, including wages, longevity pay, employee retirement contributions, and sick leave. One of its recommendations was to accept the VPOA's proposal as to retiree medical benefits.

The VPOA and the City met "off the record" on December 6, 2013, to discuss the factfinder's recommendations, but did not reach a deal on a new labor agreement. On December 12, the City informed the VPOA that the City Council would consider imposing terms and conditions of employment at its December 16 meeting. The City wrote that it understood the "VPOA's strong desire to protect the wages of its current members for purposes of retention. Accordingly, . . . City staff has recommended that the City Council only impose the highest priority terms of its last, best and final offer, including the proposed changes to the City's direct PEMHCA contribution and related impacts to retiree medical benefits."

The City Council approved the staff recommendations, and passed the December 2013 resolution discussed above.

3.      *Analysis*

The VPOA argues that the City violated the MMBA by engaging in impermissible surface bargaining, as shown by the City's "predetermination to reduce retiree medical benefits" and its premature declaration of impasse. We conclude that substantial evidence supports the trial court's findings to the contrary.

27

a.    *Surface Bargaining*

The City stood firm on its position that it would contribute only $300 per month toward retiree medical premiums, but that does not in itself constitute surface bargaining. The City emphasizes that although it maintained its initial position on this issue, it moved on other significant proposals, and the VPOA does not contend otherwise. The City's position on this issue was supported by a rational argument that was communicated to the VPOA from the beginning of negotiations: the City wanted to reduce its contribution for retiree medical benefits, for all employees, to $300 per month as a way of achieving savings and maintaining fiscal stability.[18] This constitutes substantial evidence to support the trial court's finding. (See *Regents 2010, supra,* PERB Dec. No. 2094-H [34 PERC ¶ 41, pp. 190-191].)

In essence, the VPOA argues that even though the City changed its positions on several of the issues in contention over the course of negotiations, the City's failure to move on one of those issues—retiree medical benefits—constitutes surface bargaining. The VPOA cites no authority to support such an extreme position.

The VPOA argues that the City's business plan did not absolve the City of its obligation to bargain over retiree medical proposals. The obligation to bargain, however, does not impair the City's right to stand on an issue. (*Dal Porto*, *supra*, 163 Cal.App.3d at p. 549.) And even if the City's business plan did not absolutely require the City to insist on a contribution of $300 per month toward all employees' retiree medical benefits, it provided a rational justification for the City's position. The City's refusal to accept the VPOA's proposal that the City pay 75 percent of the Kaiser rate for retirees, to be funded in part by VPOA member's contributions to a trust, was accompanied by a rational

---

[18] During the course of the negotiations, the City's negotiators also explained to the VPOA that the City was trying to equalize health and welfare benefits across employee groups. The retiree medical proposal was identical to terms that other unions accepted during the bankruptcy and to terms applied to unrepresented City employees under a 2009 resolution.

justification: "the city will not consent to any language which could establish a long term, unrestricted, unknown growth of an employee or retiree benefit."

The VPOA also argues that the City's insistence on obtaining the same terms for retiree medical benefits across unions was improper. The argument lacks merit. An employer may engage in hard bargaining by seeking the same concessions from its unions without violating the MMBA. (*County of Solano* (2014) PERB Dec. No. 2402-M, pp. 9-10 [39 PERC ¶ 78].)

> b. *Rush to Impasse*

Substantial evidence also supports the trial court's finding that the City did not rush to impasse. The parties engaged in negotiations and discussions over a period of more than a year before the City declared impasse in September 2013. During that period the parties exchanged and modified proposals several times, with the last counterproposal from the VPOA in July 2013. With no further progress, despite additional discussions, after two more months the City provided its last, best, and final offer and declared impasse. The extended period of negotiation, the parties' exchanges of proposals and the two-month period between the last exchange of proposals and the declaration of impasse constitute substantial evidence that the City did not rush to impasse, but rather declared impasse in response to a deadlock.

The VPOA contends that the parties were not at impasse because further bargaining was not futile. This position lacks merit. All the evidence before us suggests that retiree medical benefits was a primary issue of contention for both the City and the VPOA, and that the VPOA was as committed to its view that retirees had a vested right to the full Kaiser rate as the City was to its view that the VPOA should accept a retiree medical benefit of $300 per month.

The VPOA also argues that the parties were not at impasse because the City still had room to move, as evidenced by the City's subsequent modification of the sick leave buy-back proposal in the City's last, best, and final offer. We are not persuaded, in view of the City's detailed explanation in its letter to the VPOA of why it believed there was an impasse. Finally, the VPOA contends that the City's statement in its declaration of

29

impasse that it remained open to a counterproposal from the VPOA is evidence that there was no impasse. But there can be impasse when the parties are deadlocked on a major issue, even if the parties continue to meet and even if movement is possible on other issues. (*SUPA*, *supra*, PERB Dec. No. 520-H [9 PERC § 16207, p. 888].)

In sum, substantial evidence supports the trial court's findings that, considering the totality of the circumstances, the City did not engage in surface bargaining or rush to declare impasse. The VPOA did not establish that the City violated the MMBA, and therefore we need not reach the VPOA's argument that it is entitled to a remedy.

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

_____
Miller, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VALLEJO POLICE OFFICERS ASSOCIATION,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF VALLEJO,<br><br>     Defendant and Respondent. | A144987<br><br>(Solano County<br>Super. Ct. No. FCS042492) |

BY THE COURT:

The opinion in the above-entitled matter filed on August 22, 2017, was not certified for publication in the Official Reports.  For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                             Kline, P.J.

1

Trial Court:  Superior Court of Solano County

Trial Judge:  Hon. Paul L. Beeman


Attorneys for Appellant                           Mastagni Holstedt
                                                  David E. Mastagni
                                                  Isaac S. Stevens
                                                  Tashayla D. Billington


Attorneys for Amici Curiae:
Los Angeles Retired Fire & Police Association, Inc.
Retired Employees Association of Orange County
Sacramento Area Firefighters, International Association
   of Firefighters, Local 522, AFL-CIO
Palo Alto Firefighters, International Association
   Of Firefighters, Local 1319, AFL-CIO
Sacramento Police Officers' Association
Los Angeles Airport Peace Officers' Association
Sacramento County Deputy Sheriff's Association
San Mateo County Deputy Sheriff's Association
in support of Appellant                           Rosen Bien Galvan & Grunfeld LLP
                                                  Ernest Galvan
                                                  Margot Mendelson
                                                  Jenny S. Yelin


Attorneys for Amicus Curiae Coalition of Public Safety
Labor Associations in support of Appellant        Messing Adam & Jasmine LLP
                                                  Gregg McLean Adam
                                                  Gary M. Messing


Attorneys for Respondent                          Renne Sloan Holtzman Sakai LLP
                                                  Jonathan V. Holtzman
                                                  Charles D. Sakai
                                                  Erich W. Shiners


Attorneys for Amicus Curiae League of California Cities
in support of Respondent                          Liebert Cassidy Whitmore
                                                  Steven M. Berliner
                                                  Michael D. Youril