Filed 6/27/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANNE BROOME et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br>     Defendant and Respondent. | A160591 <br><br> (Alameda County <br> Super. Ct. No. RG14744056) |

       Anne Broome and William Gurtner (Plaintiffs), retired employees of the University of California (University), sued the University's governing body, the Board of Regents (Regents), for breach of contract, promissory estoppel, and related claims, alleging Regents violated an obligation to provide them with certain pension benefits.  The trial court issued judgment in favor of Regents and Plaintiffs appeal.  We affirm.

FACTUAL BACKGROUND

*The 1999 Resolution*

       The University of California Retirement Plan (UCRP or Plan) is a defined benefit plan "subject to federal tax laws in the administration of benefits accruing to its members."  In January and February 1999, the University's President (President) addressed the Regents' Committee on Finance regarding two federal tax law limitations on benefits that could be

1

paid by the Plan.  The limitation relevant here imposed, for employees hired after a certain date, a "maximum compensation amount that can be used for retirement calculations"—at that time, $160,000—such that employees earning more than the maximum "cannot receive benefits based on the full compensation that UCRP would otherwise use for benefit calculations."[1]  The President reported the limitations "are a significant deterrent to recruitment and retention of faculty, staff, administrators, scientists, and engineers."

The President recommended that, "[t]o remain competitive in the recruitment and retention of employees," the University should take advantage of recent amendments to the Internal Revenue Code making it possible for public institutions to "mitigate" the limitations.  As to the maximum compensation limitation, the University could "amend[] UCRP to add a provision to restore benefits that may be lost due to [the limitation], using existing UCRP assets.  Providing restoration of benefits through UCRP is contingent upon IRS approval."  Regents were advised that the cost of this amendment "will not have a material effect on the Plan assets or liabilities."

Accordingly, the President proposed, and the Finance Committee approved for presentation to the full Regents, a resolution approving the establishment of benefit restoration plans.  At the Regents' February 1999 meeting, Regents adopted the following resolution (hereafter, the 1999 Resolution):

"A.    Approval be granted to establish plans, effective January 1, 2000, to restore to University of California faculty and staff, including Department of Energy Laboratories scientists and engineers, the University of California

---

[1] The second limitation imposed a maximum annual limit on the amount of benefits that could be paid by a retirement plan.

2

Retirement Plan (UCRP) benefits earned but denied due to Internal Revenue Code limitations.

"B. These UCRP benefits also be provided to affected UCRP members who retired before the effective date of the restoration plans.

"C. Implementation of the restoration plans be delegated to the President, with the concurrence of the Chair[] of the Board and the Chair[] of the Committee on Finance."[2]

*Appendix E*

Following Regents' approval of the 1999 Resolution, the President's Office drafted a Plan amendment, referred to as Appendix E, to restore the benefits impacted by the maximum compensation limit. Appendix E was a 16-page document with detailed provisions about calculation of the benefit, form of the benefit, benefits for members who are reappointed after retirement, and disability and preretirement survivor benefits. Appendix E provided for Regents' unlimited right to amend or terminate Appendix E, and the right of the President, with the concurrence of the Chairs, to add or delete employees from Appendix E's list of members. Appendix E provided, "no person, including any Appendix E Member, has any 'vested rights' under state or federal law in any benefits that may be provided for under this Appendix E," with the exception of those members who are "employee[s] of the University upon or after attainment of age 60" and identified by Appendix E as a member.

In June 1999, the University submitted Appendix E to the IRS for approval. In December 1999, the IRS put a hold on the determination pursuant to a moratorium on certain kinds of requests for approval.

_____

[2] We refer to the Chairs of the Board and the Committee on Finance collectively as "the Chairs."

3

*Subsequent Events*

The President's office, in addition to drafting Appendix E, developed a plan to restore benefits impacted by the other federal tax law limitation addressed by the 1999 Resolution (*ante,* fn. 1). This plan did not require IRS approval. In February 2000, the President submitted the plan to the Chairs for their review, the Chairs approved the plan, and it was subsequently implemented.

In January 2007, the IRS moratorium on certain kinds of requests for approval ended. In November 2007, the IRS approved Appendix E.

In late 2008, the Chairs, along with the President, decided not to implement Appendix E or any other version of a restoration plan for benefits reduced by the maximum compensation limitation.

On March 29, 2012, Regents rescinded the 1999 Resolution's authorization of a restoration plan for benefits reduced by the maximum compensation limitation.

PROCEDURAL BACKGROUND

In 2014, Plaintiffs sued Regents on behalf of themselves and similarly situated Plan members who retired between January 1, 2000, and March 29, 2012. Plaintiffs alleged claims for impairment of contract, promissory estoppel, equitable estoppel, breach of fiduciary duty, breach of contract, breach of the covenant of good faith, and declaratory relief. Judgment on the pleadings was granted for Regents as to the equitable estoppel claim, class certification was denied as to the promissory estoppel claim, and a class was certified as to the remaining claims.

Regents filed a motion for summary judgment/adjudication, which the trial court granted except as to Plaintiffs' claims for promissory estoppel and

4

declaratory relief.[3]  Following a bench trial on Plaintiffs' individual promissory estoppel claims, the trial court issued a statement of decision finding against Plaintiffs on those claims as well as their derivative declaratory judgment claims.  Judgment issued for Regents.

DISCUSSION

I.      *Breach of Contract*

Plaintiffs challenge the trial court's ruling granting summary adjudication for Regents on Plaintiffs' contract claim.  Plaintiffs contend the 1999 Resolution created enforceable contractual rights.

"The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858.)  "In undertaking our independent review, we apply the same three-step analysis used by the trial court.  First, we identify the issues framed by the pleadings.  Second, we determine whether the moving party has established facts justifying judgment in its favor.  Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact.  [Citation.] [¶] In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing [the losing party's] evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Id.* at pp. 858–859.)

---

[3] The trial court's order also denied a motion for summary judgment filed by Plaintiffs.

A.    *Legal Background*

" '[T]he terms and conditions of public employment, unlike those of private employment, generally are established by statute or other comparable enactment (e.g., charter provision or ordinance) rather than by contract.' [Citation.]  For this reason, public employees have generally been held to possess no constitutionally protected rights in the terms and conditions of their employment." (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 977, fn. omitted (*Cal Fire*).)  It is a "fundamental principle that the terms and conditions of public employment, to the extent those terms and conditions derive from legislative enactments, are not generally protected by the contract clause from repeal or revision at the discretion of the legislative body."[4]  (*Id.* at p. 978.)

There are "two exceptions to the general rule permitting legislative modification of statutory terms and conditions of public employment.  The first, applicable to statutorily created employment rights generally, affords the protection of the contract clause to statutory terms and conditions of public employment when the statute or ordinance establishing the benefit and the circumstances of its enactment clearly evince a legislative intent to create contractual rights.  The second exception, which this court has historically extended primarily to pension rights, protects certain benefits of public employment by implication, even in the absence of a clear manifestation of legislative intent." (*Cal Fire, supra,* 6 Cal.5th at pp. 978–979.)

---

[4] "Regents have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute." (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165.)

6

B.     *Clear Intent to Create Contractual Rights*

Under the first exception, " '[a]lthough the intent to make a contract must be clear, our case law does not inexorably require that the intent be express.  [Citation.] . . . Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown.' " (*Cal Fire, supra,* 6 Cal.5th at p. 980.)  *Cal Fire* discussed such a case, *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171 (*Retired Employees*), in which a county "had entered into a series of express contracts with its employees, in the form of MOUs, relating to their terms and conditions of employment," and "[e]ach of these MOUs had been ratified by a resolution of the board of supervisors."  (*Cal Fire,* at p. 980.)  As *Cal Fire* explained, "it was critical to *Retired Employees'* holding that the legislative enactment on which the implied contractual rights were premised was a resolution approving an express contract of employment." (*Id.* at p. 981.)

In *Cal Fire* itself, public employees challenged the repeal of a statute granting them the opportunity to purchase retirement service credit and thereby receive pension benefits calculated on the basis of more public employment time than they actually worked.[5]  (*Cal Fire, supra,* 6 Cal.5th at p. 970.)  In contrast with the county's contract ratification in *Retired Employees*, "Nothing of the sort occurred in connection with the opportunity to purchase [retirement service] credit.  The Legislature did not engage in any sort of negotiation with the public employees covered by [the statute], let alone ratify an express or implied contract reflecting its terms.  The Legislature simply enacted a statute granting the opportunity to purchase

---

[5] Employees who had already purchased service credit were not impacted by the repeal.  (*Cal Fire, supra,* 6 Cal.5th at p. 981.)

[such] credit. . . . [S]uch statutes, which announce a policy rather than create a contract, ' "are inherently subject to revision and repeal." ' " (*Cal Fire,* at p. 981.)

The circumstances surrounding the 1999 Resolution are akin to those in *Cal Fire,* and entirely unlike those in *Retired Employees.* The 1999 Resolution did not ratify a contract or follow negotiations with public employees. Indeed, there is less evidence of an intent to create contractual rights than in *Cal Fire* because the 1999 Resolution did not even implement any employee benefits; instead, it simply granted "[a]pproval . . . *to establish plans*" (italics added), belying any clear intent to create contractual rights by virtue of the 1999 Resolution alone.

Moreover, by its own terms, the 1999 Resolution delegated a future implementation to the President, "with the concurrence of" the Chairs. Plaintiffs argue the concurrence provision is ambiguous, either on its face or in light of extrinsic evidence,[6] as to whether the 1999 Resolution granted the Chairs "discretion with regard to the specifics of *implementation* of the Regents' policy" or whether it authorized them to "mak[e] a judgment as to whether to implement that policy at all." Even assuming the former, the 1999 Resolution expressly contemplated further review and action before any employee benefit was in fact provided, and therefore does not clearly evince an intent to create contractual rights.

---

[6] We reject Regents' assertion that Plaintiffs forfeited reliance on extrinsic evidence. Plaintiffs relied on extrinsic evidence in their opposition to Regents' summary judgment/adjudication motion below, the grant of which is before us.

C.    *Implied Contractual Rights*

"[A] contractual right to receive pension benefits is implied, despite their statutory foundation, because they constitute a form of deferred compensation. . . . [A] public employee 'is not fully compensated upon receiving . . . salary payments because, in addition, [the employee] has then earned certain pension benefits, the payment of which is to be made at a future date.  While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due.' [Citation.]  Given their character as deferred compensation, the receipt of legislatively established pension benefits is protected by the contract clause, even in the absence of a manifest legislative intent to create contractual rights." (*Cal Fire, supra,* 6 Cal.5th at pp. 984–985.)  "[T]he receipt of pension benefits is granted constitutional protection because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time." (*Id.* at p. 985.)[7]

Various cases illustrate this principle.  In *Kern v. City of Long Beach* (1947) 29 Cal.2d 848 (*Kern*), when the petitioner began city employment, the city charter provided for pensions under specified terms.  (*Id.* at p. 850.)  The Supreme Court held the petitioner had an implied contractual right to this

---

[7] "[E]lements of public employee compensation other than pension benefits also may be entitled to this type of implied contractual protection," for example, "earned salary." (*Cal Fire, supra,* 6 Cal.5th at pp. 985–986.)

9

benefit such that the city could not, shortly before the petitioner completed the required years of service, eliminate pensions as to all employees not then eligible for retirement. (*Id.* at pp. 850, 856.) In *Olson v. Cory* (1980) 27 Cal.3d 532 (*Olson*), a state statute provided for annual full cost-of-living increases for judicial salaries. (*Id.* at p. 536 & fn.1.) The Supreme Court held state judges "had a vested right not only to their office for a certain term but also to an annual increase in salary" during that term pursuant to the state statute, such that the Legislature could not limit the cost-of-living increases for terms commenced when the statute was in effect. (*Id.* at pp. 538–540.) In *Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213 (*Requa*), the Court of Appeal held University retirees sufficiently pled an implied contract claim against the University for certain retirement health benefits by alleging "the authorization of those benefits in 1961, the uninterrupted provision of those benefits for more than 50 years, and . . . the University's publications assuring employees they would receive [these] benefits in retirement so long as they met certain eligibility requirements." (*Id.* at p. 226.)

In *Kern, Olson,* and *Requa,* the benefit promised by the public employer was in effect during the employee's employment. In contrast, the 1999 Resolution did not itself implement restoration benefits—indeed, it did not even specify the terms of such benefits such that the parties could determine with precision any contractual obligation. Although Appendix E did provide such specifics, neither Appendix E nor any other version of a restoration benefit plan for the maximum compensation limit ever took effect.[8]

---

[8] Moreover, there is no evidence Plaintiffs or any other class members would have been entitled to benefits under Appendix E even if it had taken effect. Under Appendix E's own terms, only identified "Members" were

10

Accordingly, unlike the employees in the above cases, Plaintiffs never earned restoration benefits through their employment. (Cf. *Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 550 [" ' "By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those *then offered by the employer*." ' " (Italics added)].)

Plaintiffs argue the 1999 Resolution constituted an offer to provide restoration benefits in the future, which Plaintiffs accepted by their continued employment. Even so assuming, the 1999 Resolution expressly provided implementation of the benefits was conditioned on an event that never occurred: the Chairs' concurrence in an implementation plan proposed by the President. Plaintiffs point to extrinsic evidence they contend shows that the *only* condition of the 1999 Resolution's offer of restoration benefits was IRS approval. As an initial matter, we question whether the evidence can reasonably be so construed.[9] In any event—and even assuming the

---

eligible for benefits, and Appendix E left it to the President's "sole discretion," with the concurrence of the Chairs, to add to or delete from that category. Although Plaintiffs claim Regents stipulated they "would have received the benefit but for the Regents' breach of contract," the cited stipulation is only to certification of a class of retirees "whose retirement benefits were reduced as a result of" the maximum compensation limit.

[9] Much of the relied-upon evidence consists of University statements or communications about the need to obtain IRS approval for the restoration benefit plan without mentioning the need to obtain the Chairs' concurrence: (1) a February 1999 website posting announcing the Regents "approved plans to restore" the benefits addressed in the 1999 Resolution, adding "[t]he plans are subject to Internal Revenue Service approval and would apply to UC faculty, staff and retirees from the date of implementation"; (2) notices posted before the June 1999 submission of Appendix E to the IRS announcing the University's intent to seek IRS approval; (3) updates to the University's Retirement System Advisory Board stating that "[a]doption and implementation of the provisions of Appendix E, and thus the ability to

11

relied-upon evidence is admissible[10]—the contention is unavailing.  The 1999 Resolution contains express language setting forth the concurrence condition and " 'the law does not recognize implied contract terms that are at variance with the terms of the contract as expressly agreed or as prescribed by

provide restoration of benefits through UCRP, is contingent upon IRS approval"; (4) the University's conduct, prior to the IRS's moratorium, of identifying employees who would be eligible for restoration benefits and preparing letters to them stating, "Assuming IRS approval, it is expected that the implementation date of these supplemental benefits will be January 1, 2000"; (5) letters to new hires between 2000 and 2004 setting forth current benefits and stating, "no covered compensation in excess of [the current limit] will be included in the calculation of your UCRP retirement benefit," but "an amendment to our Plan to permit payment of benefits generated in excess of the [federal tax law] limit is currently under consideration by the Internal Revenue Service.  It is our hope that we will receive a favorable response this year"; and (6) a 2006 letter to a former University chancellor informing him that "[t]he University has no intention of pulling back its request [to the IRS] for a favorable determination [of Appendix E] at this time" and, if the IRS issued a favorable determination, "we would intend to provide all supplemental benefits authorized by the Appendix on a prospective basis." These statements do not expressly negate the concurrence requirement or provide that a restoration benefit plan will definitively be implemented upon receipt of IRS approval.  Plaintiffs also point to the inclusion of the costs and liabilities of Appendix E in the 2008, 2009, and 2010 "Actuarial Valuation Report" for the Plan, but these reports included the caveat that "Appendix E has not been implemented" and made no promise of future implementation or statement disavowing the concurrence requirement.  Finally, Plaintiffs rely on Regents' admission that in no other instance in which a policy or resolution delegated implementation to a University officer with the concurrence of one or more Regents was the policy not implemented.  We are dubious that this constitutes evidence the concurrence requirement was in every instance simply a meaningless formality.

[10] (See *Rose v. County of San Benito* (2022) 77 Cal.App.5th 688, 717, petn. for review pending, petn. filed May 20, 2022 ["the relevance of extrinsic evidence to prove legislative intent to confer an implied contractual right is closely related to the function of the legislative process and is defined according to the commonly recognized indicia of legislative intent"].)

statute.' " (*Retired Employees, supra,* 52 Cal.4th at p. 1181; see also *Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1351 ["parol evidence may only be introduced to prove additional terms of the contract which are consistent with the express language of the written agreement"].)

Plaintiffs argue that, despite the express language in the 1999 Resolution, the Chairs lacked discretion to decline to concur in the implementation plan. First, they point to a Regents bylaw providing the President and Chairs, "unless express authority shall be elsewhere conferred by order or resolution of [Regents], shall execute" policies approved by Regents. Plaintiffs argue that, because the concurrence provision appears in the same resolution that approved the restoration benefits policy, it is not authority conferred "elsewhere" for purposes of the bylaw, and therefore the Chairs were required to either implement the policy or go back to Regents. Plaintiffs' construction of "elsewhere" would require Regents, if it wanted to confer any discretion in implementing a policy, to issue a resolution approving the policy and then issue a separate resolution conferring such discretionary authority—a pointless exercise for which there is no support in the text of the bylaw.

In addition, Plaintiffs argue extrinsic evidence shows the concurrence provision was included solely to avoid the appearance of a conflict of interest because the President would be eligible for restoration benefits, and the Chairs had no discretion to refuse their concurrence for any other reason. Plaintiffs' evidence, construed in their favor, does not so demonstrate.[11]

---

[11] That Regents would so restrict the Chairs seems implausible. For example, the economic impact of restoration benefits on the Plan's assets was discussed in the presentation to Regents before the 1999 Resolution was approved, indicating it was an issue of concern to Regents. It is incongruous

Plaintiffs rely on comments recorded in the January 1999 Finance Committee minutes but, as Regents note, the comments related to an entirely different agenda item. Plaintiffs also point to statements by non-members of Regents about their understanding of the concurrence requirement: (1) the Director of Retirement Planning at the time the 1999 Resolution was passed averred that, based on "discussions in my Department at that time," she understood "the concurrence was designed to avoid any appearance of conflict of interest"; and (2) the President from 2003 to mid-2008 averred that he did not understand the language "to mean that I had discretion to determine whether or not the [restoration benefit plan] should be implemented" but instead "was a logical step to address a potential conflict of interest." These statements, even if admissible, are insufficient. "The subjective understandings of individuals, as well as understandings communicated outside the approval process, are not admissible as evidence of the [public employer's] intent." (*Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 617 (*Vallejo Police Officers*).)[12] We note that, even if the

Regents would have chosen to prohibit the Chairs from withholding their concurrence had Regents anticipated the economic collapse that occurred.

[12] Plaintiffs also point to deposition testimony of one of the plaintiffs, who attended the Finance Committee meetings leading up to the 1999 Resolution, that in those meetings "[t]he only contingent aspect of [the restoration plan] was it was contingent on approval by the IRS." Even assuming this testimony is sufficient to constitute evidence of Regents' intent (but see *Vallejo Police Officers, supra,* 15 Cal.App.5th at p. 617 [the plaintiff "does not identify any statement made to or by the City Council in the course of its approval of the 2009 Agreement that constitutes clear evidence that the City Council intended to confer a vested right"]), it is not evidence that the concurrence requirement is only to consider conflicts of interest, but instead suggests there was no concurrence requirement at all. As stated above, Plaintiffs' extrinsic evidence cannot vary the express terms of the 1999 Resolution. (*Retired Employees, supra,* 52 Cal.4th at p. 1181.)

extrinsic evidence showed Regents anticipated or expected the Chairs would concur absent a concern about conflicts of interest, this still would not be equivalent to an intent to create contractual rights if the Chairs declined to concur for other reasons.

"[I]mplied rights to vested benefits should not be inferred without a clear basis in the contract or convincing extrinsic evidence." (*Retired Employees, supra,* 52 Cal.4th at p. 1191; see also *Chisom v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 218 Cal.App.4th 400, 414 ["[I]n order to prevent the governing body and the public from being 'blindsided by unexpected obligations,' the asserted contractual obligation must be *clearly* shown."].) Plaintiffs' evidence, construed in their favor, does not clearly show Regents intended to create contractual rights to restoration benefits even if the Chairs never concurred in a restoration benefit implementation plan.[13] Regents have demonstrated Plaintiffs cannot establish breach of contract.[14]

II.    *Promissory Estoppel*

In the trial court's statement of decision following trial on Plaintiffs' individual promissory estoppel claims, the court found, "Reliance on the

---

[13] Accordingly, we need not decide Plaintiffs' various arguments that the trial court improperly limited or refused to consider extrinsic evidence.

[14] In their opening brief, Plaintiffs argue the trial court's grant of summary adjudication as to Plaintiffs' other claims should be reversed if we reverse as to the breach of contract claim. To the extent Plaintiffs argue additional grounds for reversal in their reply brief, the arguments are forfeited. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 [" ' " 'points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before' " ' "].) Because we are affirming the contract claim ruling, we will also affirm the ruling as to the other claims.

15

Regents' vote on the 1999 Resolution is insufficient for promissory estoppel" because it is "not a clear and unambiguous promise . . . ."[15] The court also found Plaintiffs failed to establish their claims for promissory estoppel based on other oral or written promises. On appeal, Plaintiffs challenge only the trial court's ruling as to the 1999 Resolution.

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by [that party's] reliance.' " (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901.) "To be enforceable, a promise need only be ' "definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." ' [Citation.] It is only where ' "a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, [that] there is no contract." ' " (*Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1045 (*Garcia*).)

Plaintiffs do not dispute that the 1999 Resolution alone is insufficient, but argue that Appendix E "embodied the *definite* scope of the obligations" under the 1999 Resolution, such that the "1999 Resolution and Appendix E had become enforceable after the sole condition of IRS approval had been satisfied." Plaintiffs' claim fails. The 1999 Resolution expressly conditioned

---

[15] The court similarly held in its order denying Regents' motion for summary adjudication of the promissory estoppel claims, stating it was "finding a triable issue of fact on the basis of [Plaintiffs'] testimony about Respondent's oral representations alone—that is, oral promises, not written ones."

16

the implementation of benefits on the Chairs' concurrence in an implementation plan proposed by the President.[16]  Regardless of whether the concurrence was required for the decision to implement or how to implement, it is undisputed that the Chairs never concurred in Appendix E or any other implementation plan.  Therefore, the condition set forth in the 1999 Resolution did not occur.[17]

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.

---

[16] Plaintiffs argue extrinsic evidence shows the only condition was IRS approval.  Even assuming the evidence so shows (but see fn. 9, *ante*), extrinsic evidence cannot be used to establish a written instrument was a promise for promissory estoppel purposes.  "[U]nlike a party seeking to establish a promise in a pure breach of contract context, a party seeking to establish promissory estoppel cannot rely on extrinsic evidence to explain an ambiguous statement.  [Citations.] . . . '[E]xtrinsic evidence is relevant . . . in interpreting a written instrument only if the instrument's language is ambiguous . . . . It follows that if extrinsic evidence is needed to interpret a promise, then obviously the promise is not clear and unambiguous.' " (*Garcia, supra,* 183 Cal.App.4th at pp. 1044–1045.)

[17] Plaintiffs argue we should reverse judgment on their declaratory relief claim if we reverse judgment on either their contract claim or their promissory estoppel claim.  We are reversing neither, and therefore affirm as to the declaratory judgment claim.

_____

SIMONS, J.

We concur.

_____

JACKSON, P. J.

_____

BURNS, J.

(A160591)

**Broome et al. v. Regents of the University of California (A160591)**


Trial Judge:      Hon. Michael M. Markman


Trial Court:      Alameda County Superior Court


Attorneys:

 Keller Rohrback LLP, Jeffrey Lewis and Rachel E. Morowitz; Law Office of Geoffrey V. White, Geoffrey V. White; Stember Cohn & Davidson-Welling, LLC Maureen Davidson-Welling and Vincent J. Mersich for Plaintiffs and Appellants.

 Orrick, Herrington & Sutcliffe LLP, William D. Berry, Joseph C. Liburt, Eric A. Shumsky, and Lauren A. Weber for Defendant and Respondent.